WILLIAM A. STUART, by IDA STUART, Guardian, v. JACOB M. DICKINSON, Receiver, and CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellants.

In Banc, November 30, 1921.

1. **JUDGMENT OF FEDERAL COURT: Jurisdiction: Unauthorized Appearance: Collateral Attack.** Neither the constitutional provision that full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state, nor the act of Congress passed in pursuance thereof, prevents an inquiry into the jurisdiction of the court by which a judgment offered in evidence was rendered; and accordingly when a judgment recovered in one state is pleaded or presented in the courts of another state, whether as a cause of action or a defense or as evidence, the party sought to be bound or affected by it may always impeach its validity and escape its effect by showing that the court which rendered it had no jurisdiction over the parties or the subject-matter of the action; and the recitals in the record of any such judgment on the subject of jurisdiction, may be controverted by extraneous evidence. And in this case, where plaintiff sues an interstate railroad and its receiver, by his wife as the guardian of said insane plaintiff, a locomotive engineer, for injuries inflicted in the collision of trains in this State, and defendants plead by way of estoppel a judgment rendered against him in the United States District Court at Chicago, plaintiff may plead in his reply and prove that his alleged appearance in said court was unauthorized and that the attorneys who attempted to institute the action were not authorized to institute it, and that for said reason said court was without jurisdiction and its said judgment a nullity.

2. ———: **Receiver of Railroad: Discharge: Forestalling Further Litigation.** A provision in the final decree of the Federal court discharging the railroad receivership which absolved the property, after its return to the railway company, of all liability in respect to all claims against the receiver not filed with the special master for hearing and determination on or before a designated date, and a further provision by which the court attempted to retain jurisdiction for the purpose of enforcing said provision, where the

Stuart v. Dickinson.

railroad properties had not been sold, under foreclosure or other-
wise, and the earnings far exceeded the debts during the receiver-
ship, are not binding on a locomotive engineer who had been in-
jured in an accident and who had not entered his appearance in
said Federal court; nor did said court have authority to determine
the rights of parties who were not before it or subject to its juris-
diction, or to deprive them of their right to sue in the State courts
and to subject the properties of the railroad company to the pay-
ment of their just claims.

3. ————: Injury During Receivership: Subsequent Personal Judgment
   Against Company. Where the negligent act which caused plain-
   tiff's injury was committed by the receiver while he was operating
   the railroad, and under a final decree discharging the receivership
   the company assumed and became bound to pay only such claims
   against the receiver as were filed with the special master and es-
   tablished in accordance with its terms, a personal judgment may
   be rendered against the railroad company, where the railroad
   properties were not sold, but returned to the company, and the
   receiver, out of the earnings during his management, not only paid
   current operating expenses, but applied to permanent betterments
   sums which in the aggregate greatly exceeded the amount of plain-
   tiff's claim; for, independently of the decree and under general
   equitable principles, plaintiff has the right to follow the fund
   and have the property into which it has gone charged with the
   payment of his claim, when established, and under such circum-
   stances whether judgment for the amount of his claim be rendered
   against the company generally, or whether such amount be made
   merely a charge against the property, cannot be of the slightest
   advantage or make the slightest difference to the company.

4. NEGLIGENCE: Injury During Receivership: Receiver As Party Af-
   ter Discharge. In an action for the recovery of damages for per-
   sonal injuries inflicted while the railroad was in the hands of a
   receiver, brought against the receiver, but not tried until after his
   final discharge, whereupon, by amended petition the railroad com-
   pany was made a defendant, the demurrer of the receiver should
   be sustained, for the action was against the funds in his hands,
   and his negligence was official and not personal, and his discharge
   absolutely put an end to his liability. Nor is the right to continue
   him as a party defendant affected by the fact that the validity of a
   judgment in his favor and against plaintiff's claim, previously ren-
   dered by the Federal court, is an issue, for said judgment can be
   as effectually interposed as estoppel by the railroad company and
   its validity as effectually assailed by plaintiff without as by con-
   tinuing him as a party.

5. ————: **Collision of Trains: Proximate Cause: Question for Jury.** In an action for damages for personal injuries received in a head-on collision between freight trains, brought by the locomotive engineer of one of them, wherein there is evidence that the telegraph operators failed to give plaintiff proper stop signals against the opposing superior train and gave a misleading clearance card to said opposition train, and evidence that the crew of the opposition train were guilty of gross negligence in leaving their station ahead of their schedule and ran around a curve at an excessive speed, and evidence that the plaintiff, notwithstanding the operator's failure to give proper signals, knew that the opposition train would enter the block from the opposite direction if on its schedule and that his train was therefore in imminent danger and took no measures to protect it, the question whether plaintiff's negligence or defendant's negligence was the proximate cause of the collision was one for the jury.

6. ————: **Rules: Contracts: Constructions.** Rules adopted by a railroad company for the guidance of trainmen and telegraph operators in moving trains are a written contract between the company and its employees, and their construction therefore devolves exclusively upon the court.

7. ————: ————: **Construction Favorable to Employees.** If rules governing the movement of trains, adopted by the railroad company for the guidance of trainmen, are fairly subject to either of two constructions, the one most favorable to a locomotive engineer injured by a head-on collision of two trains should be adopted, because it is the duty of the company to make and enforce rules sufficiently clear and specific as to be capable of being intelligently understood and obeyed by its employees.

8. ————: ————: **Manual Block System: Instruction: Assumption of Fact.** Various rules governing the movement of trains, adopted by a railroad company for the guidance of trainmen and signalmen, and particularly the application of said rules to the manual block system and the entrance of trains into blocks and the relation of said rules to others governing the superiority of trains, and particularly of freight trains, are considered, and an attempt made to so construe them as to evolve a consistent and intelligent whole; and it is *held*, that an instruction, in which is consecutively set forth the uses and purposes of the manual block system, the performance by the signalmen of their several functions and the rights and duties of the operators of trains with respect to entering and passing through a block, "under the rules and practices" of the defendant, in the trial of the action of a locomotive engineer injured in a head-on collision of two freight trains, in which it was in effect assumed that the manual block system was in use at the

Stuart v. Dickinson.

point of collision, the case being tried on that theory on both sides, and that it was the duty of the signalmen and train operators to discharge their several functions thereunder in accordance with the rules as thus construed and reconciled, was not erroneous.

9. **INSTRUCTION: Misleading: Verdict for Plaintiff on Each of Disconnected Hypotheses.** The third paragraph of the instruction, disconnected with anything that preceded or followed it, told the jury to return a verdict for plaintiff if they found that the property of the railway company had been returned to it by the receiver without sale or foreclosure, with betterments exceeding in value $75,000—facts which were not controverted. The first and second paragraphs purported to be, within themselves, a complete instruction, and set forth the facts that, if found to be true, would constitute negligence and authorized a verdict "in favor of plaintiff." The evident intention of the instruction was to direct the jury that if they found the facts under the first and second paragraphs they should return a verdict against the receiver, and if, in addition, they found the facts specified in the third paragraph they should return a verdict for plaintiff against both the receiver and the railroad company. *Held,* that it cannot be concluded that the jury necessarily, or even probably, understood that they were required to find for plaintiff under the first and second paragraphs before they could find for him under the third, in the face of the plain import of the third's language, and therefore the said third paragraph was so misleading as to necessitate a reversal of the judgment for plaintiff.

Appeal from Jackson Circuit Court.—*Hon. Clarence A. Burney,* Judge.

REVERSED AND REMANDED.

*Luther Burns* and *Guthrie, Conrad & Durham* for appellants.

(1) The court erred in not sustaining the instructions of defendants in the nature of demurrers to the evidence. (a) The cause of action here involved has been adjudicated by the District Court of the United States for the Northern District of Illinois, and its judgment is final. The decree of the Illinois court is *res judicata* and is not subject to collateral attack. Distinction between direct and collateral attack, and when

collateral attack can be made. Lieber v. Lieber, 239 Mo. 1; Wilson v. Wilson, 255 Mo. 536; Reed Bros. v. Nicholson, 158 Mo. 631; Martin v. Baron, 39 Mo. 301; Burk v. City of Kansas, 118 Mo. 327; McDermott v. Gray, 198 Mo. 382; Desloy v. Tucker, 196 Mo. 601; State ex rel. v. Ross, 118 Mo. 45; Johnson v. Realty Co., 167 Mo. 339. Stuart's insanity cannot be raised collaterally. Crow v. Meyersieck, 88 Mo. 411; Berger v. Boardman, 254 Mo. 238, 258; Koenig v. Railway Co., 194 Mo. 564. The authority of plaintiff's attorneys cannot be attacked collaterally. Scott v. Royston, 223 Mo. 668, 692; Cochran v. Thomas, 131 Mo. 258. Plaintiff entered appearance in the Illinois court. The claim was filed for the guardian, and the attorneys filing it were authorized to do so. Scott v. Royston, 223 Mo. 568; Arn v. Arn, 264 Mo. 19; Koenig v. Railway, 194 Mo. 564; Berger v. Boardman, 254 Mo. 261. (b) Even though no appearance was made by the plaintiff or for him in the Illinois court, he was bound by the decree of that court. Guaranty Trust Co. v. Mo. Pac. Ry., 238 Fed. 812; St. Louis & San Francisco Ry. v. McElvain, 253 Fed. 123; Mendenhall v. Chicago Great Western Ry., 135 N. W. 620; Goodwin v. A. T. & S. F. Ry., 118 Fed. 403. (c) To permit plaintiff to recover would be in violation of the Constitution of the United States. Would deny full faith and credit to the judgment and decree of the Illinois court in violation of Section 1, Article 4, of the Constitution of the United States. Authorities above. Would deny defendants the privileges and immunities of citizens of the several states in violation of Section 2, Article 4, of the Constitution of the United States. Would deprive defendants of their property without due process of law, and deny them the equal protection of the law, in violation of Section 1, Article 14, of the Constitution of the United States. (d) The negligence, if any, of defendants, was not the proximate cause of the accident. Warner v. Ry. Co., 178 Mo. 133; Pippin v. Con. Co., 187 Mo. App. 360, 369; Yocum v. Lusk, 223 S. W. 53. (e) The personal judgment against the

Chicago, Rock Island & Pacific Railway Company is erroneous. State v. St. Louis & San Francisco Railroad Co., 125 Mo. 596; Hill v. Ry. Co., 82 Mo. App. 188; Gate City Nat. Bank v. Chick, 170 Mo. App. 343. (2) The court committed error in giving the plaintiff's Instructions 1, 2, 3 and 4. (a) Instruction 1 does not define the practices, and there was no evidence on which the jury could find that the practices abrogated the rules. Finnegan v. Railway Co., 244 Mo. 608; Yocum v. Lusk, 223 S. W. 53. (b) The second paragraph of the instruction is independent of the first and is not predicated on the jury's finding the facts set out in the first paragraph of the instruction to be true. (c) The third paragraph of the instruction is independent of the first and second paragraphs, and is not predicated on the jury's finding the facts set out in the first and second paragraphs to be true. (d) The third paragraph of the instruction is erroneous because it permits a recovery against the railway company. (e) Instruction 2 submits the wrong measure of damages. (f) Instruction 3 and 4 fail to require a finding by the jury that the guardian disaffirmed the act of counsel in filing claim.

*T. J. Madden* and *H. G. Pope* for respondent.

(1) Counsel say that we attempted to show an abrogation of rules. What we attempted to show may be more properly termed an application of the rules under this system instead of the abrogation of some of them. We had a right to show the method of operation under the manual block system. That was the highest and best interpretation and construction the rules could have. These rules apparently conflict with each other, and, like all human arrangements, have to be worked out and harmonized in actual operation. It was, and still is, our theory that these rules worked out harmoniously in operation as plaintiff's witnesses described. It must be remembered that these rules cover a multitude of con-

ditions and circumstances, under which some of them apply and others do not. If these rules, and the rules of the time card, may be construed to be in harmony with each other, as was said in the case of Finnigan v. Railroad, 261 Mo. l. c. 502, then it is our duty to so construe them. If, on the other hand, there are some rules in conflict with the general plan of the system, then the conflicting ones may be disregarded. (2) The negligence of both operators that controlled the block is conceded and the case is argued here in counsel's brief on that assumption. One operator sent him in there without securing the block for him, and the other operator or signalman failed to protect him, when in the exercise of ordinary care he should have known he was there. The crew of Train 1-98 was negligent in running into the block in disregard of the signal given them and in violation of the rules. Under plaintiff's theory, which was abundantly supported by evidence and properly submitted to the jury, plaintiff could not have been guilty of negligence in being in the block at the time. (3) When the plaintiff failed to appear to present his claim and the evidence to support it there was only one thing that the master in chancery could do and that was to dismiss the claim for want of prosecution, and his attempt to do otherwise was void. No adversary, or court representing him, has the power to try the other party's case, and the only thing a court can do when a party fails to appear and prosecute his claim is to dismiss it. Wright v. Salisbury, 46 Mo. 28; Kelerher v. Henderson, 203 Mo. 489, 516; Garrison v. Texas & P. Ry. Co., 30 S. W. 725. (4) Under the contract between Mrs. Stuart and E. C. Whitsett the latter was without authority to file this claim in the receivership proceeding, and the master in chancery acquired no jurisdiction to hear and determine the claim on its merits. Whitsett's authority was strictly limited to an adjustment of the claim and the means whereby he was to accomplish that end were definitely stated and confined by the terms of the instrument. He was the

only lawyer employed by her and whatever was done by Mr. Pope or the firm of Bird & Pope was done through Mr. Whitsett, and there was no other contract until August, 1917, when other attorneys were employed. What he did or attempted to do beyond the limits of that instrument is not binding on the plaintiff unless ratified by the guardian. Mrs. Stuart as well as Mr. Whitsett testified that she repudiated his action in filing the claim as soon as it came to her attention. Counsel for appellants, as well as the master in chancery, were immediately notified by correspondence and direct notice in writing that the claim was filed without authority, and this notice was given prior to the hearing before the master, and hence it cannot be claimed that the master had any right to rely on presumptions or apparent authority to file the claim. Graves v. Graves, 255 Mo. 468; Martin v. Augedahl, 38 Sup. Ct. Rep. 452; 13 Am. & Eng. Ency. Law (2 Ed.), 992; Wisconsin v. Ins. Co., 127 U. S. 265; Thompson v. Whitman, 18 Wall. 457; Cole v. Cunningham, 133 U. S. 107; Hall v. Lanning, 91 U. S. 160; Reynolds v. Stockton, 140 U. S. 254; Grover v. Radcliffe, 137 U. S. 287; Christmas v. Russell, 5 Wall. 290; Hazeltine v. Ins. Co., 55 Fed. 743; Hubbard v. Inv. Co., 70 Fed. 808; Zepp v. Hager, 70 Ill. 223; McMillan v. Lovejoy, 115 Ill. 498; Latimer v. Rld., 43 Mo. 105; Barney v. White, 46 Mo. 137; Hays v. Merkle, 70 Mo. App. 509; Hamill v. Talbott, 72 Mo. App. 22; Corby v. Wright, 4 Mo. App. 443. See also Burbank v. Ernst, 232 U. S. 162; Milburn v. Chinn, 202 Fed. 175; Hester v. Frink, 189 Mo. App. 40; L. Assn. v. McDonough, 204 U. S. 8; Davis v. Davis, 174 Fed. 786. (5) In Missouri the law is well settled that the record of a judgment rendered in another state may be impeached in a collateral proceeding by evidence showing that the party had no notice of the action and never authorized anyone to appear for him, even though the record affirmatively shows the contrary. Napton v. Leaton, 71 Mo. 358; Hays v. Merkle, 67 Mo. App. 55; Weller Mfg. Co. v. Eaton, 81 Mo. App. 663; Munhall v. Mitchell, 178 Mo. App. 494,

499; Citizens State Bank v. Shanklin, 174 Mo. App. 639; Haddock v. Haddock, 201 U. S. 562, 573; Educational Soc. v. LaRue, 164 Mo.. App. 100; Broussard v. Mason, 186 Mo. App. 408; Trimble Bros. v. Stamper, 179 Mo. App. 300; Cooper v. Newell, 173 U. S. 555; Bigelow v. Smelting Co., 225 U. S. 111; Dupasseur v. Rochereau, 21 Wall. 130. (6) Appellants claim that "even though no appearance was made by the plaintiff or for him he would be bound by the Illinois decree." We assume that this means that the Chicago court had jurisdiction over the plaintiff, whether he appeared or not. Counsel seem to think that because a court has once acquired jurisdiction over a railroad company that it draws to itself jurisdiction over all parties who may have been affected or injured by it whether they wish to subject themselves to its jurisdiction or not. Truly this power, if it exists, is appalling. Counsel seem to forget that claims of this character differ from the claims of bondholders, stockholders or claims of creditor against the old company. They cite the cases of Guaranty Trust Co. v. Mo. Pac. Ry. Co., 238 Fed. 123 and Ry. Co. v. McElvain, 253 Fed. 123; Hanlon v. Smith, 175 Fed. 192; Chicago Ry. Co. v. Hulbert, 205 Fed. 250; Hawkins v. Ry. Co., 202 S. W. 1060; Smith v. Jones Lumber Co., 200 Fed. 647. (6) It was not necessary to tell the jury that the three separate paragraphs in the instruction were to be considered together. Certainly it must be assumed that the jury had some sense. It was all one instruction and so designated and it was not necessary to tell the jury that the second paragraph was to be based on the first and the third paragraph on both. The argument against this instruction is too refined and technical for any practical use. The first paragraph of the instruction was devoted to the rules and practices of the company. The jury was required to find under this paragraph the meaning of a clear signal and the rights under the rules that plaintiff's train had in the block. If they found the facts submitted to them in that paragraph in

Stuart v. Dickinson.

the affirmative, then the plaintiff upon receiving the clear signal and entering the block had the absolute right of way within it irrespective of the question of time. Following that finding the second paragraph instructed the jury that if the clear signal was given the plaintiff had the right to enter the block and to proceed to the end thereof even though he encroached on the time of the east-bound train, for that was what an affirmative finding of the facts in the first paragraph implied. The second paragraph then proceeds to submit the questions of negligence for the jury's finding and the proximate connection between the negligence and the collision. This authorized a verdict in favor of the plaintiff unless the cause of action was barred by the judgment of the Chicago court, which question was left open. The third paragraph submits to the jury the question as to whether or not the defendant railway company had assumed the defense of this action and that the railway system was redelivered to it with betterments exceeding the sum sued for, and if the jury so found (which fact was really undisputed) then the verdict should be against both defendants. Counsel's contention that this paragraph is wholly separate and independent of the foregoing part of the instruction is utterly without reason. This third paragraph immediately followed the second paragraph on the same page and the jury had no arbitrary right to separate it from what preceded it.

RAGLAND, C.—This is an action under the Employers' Liability Act for personal injuries received in a head-on collision between two freight trains on a line of the Chicago, Rock Island & Pacific Railway Company. The plaintiff was the locomotive engineer in charge of one of the trains; and whether negligence on his part, or negligence of the crew of the opposing train, or that of the telegraph operators or signalmen who gave the signals under which the two trains were being operated, caused the collision, was the mainly contested issue in the trial below.

The collision just referred to occurred June 27, 1915, near Platt River, a station about nine miles east of St. Joseph, Missouri. The colliding trains were both regular time-table trains running on schedule, one, known as 1-93, bound from Trenton, Missouri, to Horton, Kansas, and the other, known as 1-98, from Horton to Trenton. At that time the entire Rock Island System was being managed and operated by the defendant Dickinson, as receiver (hereinafter called the receiver), under the orders of the United States District Court for the Northern District of Illinois. Consequently the plaintiff and all other persons then engaged in the operation of the roads of the defendant Chicago, Rock Island & Pacific Railway Company (hereinafter called the Railway Company) were employees of the receiver.

The manual of rules and regulations governing the operation of trains on the Rock Island lines was introduced in evidence. The rules that have been stressed as applicable to the situation under consideration will be set out. Under the general head, "Movement of Trains," are found rules 87, 88, 92, 99, and 106, as follows:

"87. An inferior train must keep out of the way of opposing superior trains and failing to clear the main track by the time required by rule must be protected as prescribed in Rule 99.

"88. At meeting points between trains of the same class, the inferior train must clear the main track before the leaving time of the superior train.

"92. A train must not leave a station in advance of its schedule leaving time.

"99. When a train stops or is delayed under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. One-fourth mile from the rear of the train he will place one torpedo on the rail; continuing back three-fourths mile from the rear of the train, he will place two torpedoes on the rail, two-rail lengths apart. During foggy or stormy weather, or in the vicinity of obscure curves

or descending grades, or if other conditions require it, the flagman will increase the distance, placing two more torpedoes, two-rail lengths apart, at the farthest point reached. He may then return to the single torpedo, where he must remain until relieved by another flagman or is recalled. When recalled but not before, if he does not see or hear an approaching train, the single torpedo will be removed. In stormy or foggy weather, or if the view for at least one-quarter mile to the rear of the train is not clear, or if other conditions warrant, he will leave a burning red fuse to protect the train while returning. . . .

"When it is necessary to protect the front of a train, or if any other running track is seen to be unsafe or obstructed, the same precautions shall be observed.

"106. In all cases of doubt or uncertainty the safe course must be taken and no risks run."

Under the title, "Manual Block System Rules," the following are found:

"301.                      HOME BLOCK SIGNALS.

| Signal | Occasion For Use | Indication | Name |
| --- | --- | --- | --- |
| Color | The signal will be displayed when | For Enginemen and Trainmen | As used in rules |
| (a) Red | Block is not clear | Stop | Stop-signal |
| (b) Yellow | Block is not clear | Proceed under control | Caution-signal |
| (c) Green | Block is clear | Proceed | Clear-signal |

"Where the semaphore is used, the governing arm is displayed to the right of the signal mast as seen from an approaching train, and the indications are given by positions.

"Horizontal as the equivalent of (a).

"Diagonal as the equivalent of (b).

"Vertical as the equivalent of (c).

"302. Block signals control the use of the blocks but, unless otherwise provided, do not supersede the superiority of trains; nor dispense with the use or the observance of other signals whenever and wherever they may be required.

"317. (To be used for opposing and following movements).

"To admit a train to a block the signalman must examine the block record, and if the block is clear, will give '1 for (No. 19)' to the next block station in advance. The signalman receiving this signal, if the block is clear, must display the stop-signal to opposing trains and reply 'S. D. for (No. 19).' If the block is not clear, he must reply '5 of (No. 73).' The signalman at the entrance of the block must then display the proper signal indication.

"A train must not be admitted to a block which is occupied by a passenger train, nor a passenger train admitted to a block unless it is clear, except as provided in Rules 332, 381 and 382, or by train order.

"To permit a freight train to follow a freight train into a block, the signalman must give '17 for (No. 87)' to the next block station in advance, to which the reply '5 of (No. 95), S. D. for (No. 87)' must be made. The approaching train will then be admitted to the block with a block restrictions card.

"322. Should there be any indication of conditions endangering a train, the signalman must immediately notify the signalman at the next block station in advance, and each must display stop-signals to all trains that may be affected and must not permit any train to proceed until it is known that the track is not obstructed.

"325. A signalman informed of any obstruction in a block must display the stop-signal and notify the signalman at the other end of that block. The signalman at the other end of the block must immediately display the stop-signal. The clear-signal for that block must not be displayed until the obstruction is removed.

"332. If, from any cause, a signalman be unable to communicate with the next block station in advance, he must stop *every train approaching in that direction.* Should no cause for detaining the train be known, it may then be permitted to proceed, with a caution card (Form D), provided ten minutes have elapsed since the passage of the last preceding train.

"381. When trains are to meet or pass at an intermediate siding, train orders to that effect must be given them. This must be done, whenever practicable, before they reach the block stations at the entrance to the block within which the intermediate siding is located.

"The signalmen at these block stations must be given copies of the order addressed to them. They will deliver a copy of such orders to each conductor and engineman of the trains concerned, together with clearance cards (Form A) on which shall be stated the block restrictions.* Having received these, the trains concerned may proceed and fulfill their train orders.

"382. A train accepting a signal to proceed to the next block station on its schedule or right, and failing to do so, must take an intermediate siding or protect itself as prescribed by Rule 99. A superior train (in either direction) will be permitted to enter the block under block restrictions."

On the time card, a copy of which was delivered to all employees engaged in the operation of trains on the division of which the Horton Line was a part, this rule was printed: "While it is important to make schedule, SAFETY MUST BE GIVEN FIRST CONSIDERATION."

The caution card referred to in Rule 332 contained this language: "You may proceed  .  .  .  with caution, expecting to find track obstructed." On receiving such a card an engineer was required to proceed with his train under control, that is, at such a rate of speed that he could stop it at any time within the distance that the track was seen to be clear.

290 Mo.—34

Under the general rules governing the movements of trains a superior train was defined as one having precedence over another train. This superiority might arise from class or direction; 1-93 and 1-98 were both second-class trains, but 1-98 was the superior train because east-bound.

In June, 1915, the line from Trenton to Horton was operated under the manual block system. A "block" is defined in the book of rules offered in evidence as "a length of track of defined limits, the use of which by trains is controlled by block signals." On the line in question a block consisted of the track from one open telegraph station to the next—in either direction. A siding between such stations was called an intermediate siding. The first telegraph or block station east of St. Joseph was Platt River; the next was Clarksdale. Between Platt River and Clarksdale there was an intermediate siding called Stockbridge. The distance between Platt River and Clarksdale was about eleven miles and that between Platt River and Stockbridge about four miles.

Train 1-93 with plaintiff in charge as engineer left Trenton about six o'clock on the morning of June 27, 1915, for Horton via St. Joseph. It arrived at Clarksdale about six hours behind its schedule. According to the operator at the latter point, he endeavored to call the operator at Platt River some ten or twenty minutes before 1-93 reached Clarksdale, in order to secure for it the block between Clarksdale and Platt River, but being unable to do so, he then called the dispatcher at Trenton, who, he says, directed him to give 1-93 the block. In any event, without having communicated with the operator at Platt River, he gave 1-93, as it approached the station at Clarksdale, a clear signal with the semaphore, which meant that the block was clear and for it to proceed. The train stopped at the water station near the depot at 12:04 p. m. and pulled out and got under way for Platt River at 12:08. Train 1-93 had 29 loaded cars and 1 empty; it was hauling approximately 100 tons;

and its schedule running time from Clarksdale to Platt
River was thirty minutes.  Under the rules it was per-
missible for the engineer of 1-93, being behind his sched-
ule, to make up time whenever he could; some of the
plaintiff's witnesses testified that he could have reason-
ably expected to make the run to Platt River in eighteen
or twenty minutes; others for the defendant said that at
least thirty minutes would have been required.  A bul-
letin had theretofore been issued requiring trains to run
at a reduced speed over about four miles of the track
near Stockbridge.

Train 1-98 left St. Joseph for Trenton at 12:05 p.
m., hauling 24 loads of about 1000 tons; it was due to
reach Platt River at 12:30.  Before it arrived there the
operator at that point tried to call the operator at Clarks-
dale to secure for it the block between Platt River and
Clarksdale.  He testified that he could get neither the
Clarksdale operator nor the dispatcher, and that he
then talked with the operator at St. Joseph who told him
that 1-93 ought to be in the block and that it would prob-
ably take the intermediate siding at Stockbridge.  Under
that situation when 1-98 whistled for Platt River station,
the operator displayed a caution signal with the sema-
phore, that is, he dropped the arm to a diagonal posi-
tion, and as the train passed the station, at about twenty-
five miles an hour, he handed up on a hoop, first to the
engineer and then to the conductor, a clearance card,
which, however, under the head of "block restrictions"
contained this language: "1-93 may be in the block."
About a mile east of Platt River station there was a hill
around which the railroad ran in a long curve as it
climbed the grade from the Platt River side.  On the
inside of the curve there was a growth of timber which
so obstructed the view that but a comparatively short
stretch of track ahead could be seen by an engine crew
approaching the curve from either direction.  After 1-98
passed the Platt River station it increased its speed to
28 or 30 miles an hour "to make the hill."  In the mean-
time 1-93 had passed Stockbridge at 12:20 and was ap-

proaching the curve from the west running at from 25 to 30 miles an hour. They met head-on and the engines and the box cars immediately next to them of the two trains were piled up in an indiscriminate mass of twisted iron and splintered wood.

The conductor and rear brakeman of 1-98 and the operator at Platt River testified that 1-98 passed Platt River station at 12:30. The conductor further testified that immediately after the collision he looked at his watch and it was then 12:31:28. Two railroad men who were going west in search of employment were riding in the caboose of 1-93; they both testified that immediately after recovering from the shock of the collision the conductor of 1-93 took out his watch and called their attention to the fact that the watch showed 12:28, remarking at the time that 1-98 was not due out of Platt River until 12:30. The conductor's testimony with reference to this episode, if it in fact occurred, was non-committal and evasive. Within a few minutes after the collision a watch was taken off of the body of the fireman of 1-98 who had been killed; the crystal was broken and there was a dent in the case. Several witnesses for plaintiff testified that they saw this watch; that it had stopped; and that the hands indicated 12:28.

Plaintiff was found by the side of the track unconscious. The same afternoon he was taken to a hospital at St. Joseph, where an examination disclosed that his principal physical injury was a fracture of the skull. An operation was performed, in which a portion of the skull, about an inch and a half by two inches, at the juncture of the parietal and occipital bones, somewhat on the left side, was taken out. At the same time approximately a half teacupful of serum and bloody water was drawn off the brain, and with it came about a half teaspoonful of brain substance. He remained unconscious for five or six weeks. About the first of the following October he was taken to his home at Trenton. At the time he left the hospital he was insane and partially paralyzed on the right side, and has been in that condi-

tion ever since.  According to the experts who testified
he will never improve, but on the contrary will gradually
grow worse.  During the latter part of 1917 he received
treatment for several months at a private sanitarium
without apparent benefit.  Later he was taken to the
state hospital for the insane at St. Joseph.  Plaintiff at
the time of his injury was thirty-five years of age
and had been in the service of the Railway Company
as a locomotive engineer for about seven years.  Prior to
his injury he was a strong, active man, in good health
physically, and steadily employed, earning about $200
a month; he was an accomplished musician; and his men-
tality was at least equal to that of the average normal
man.

The rules and regulations, of which those hereinbe-
fore set out are a part, became effective April 1, 1910,
and remained continuously in force thereafter, during
the operation of the roads by the railway company and
subsequently by the receiver.  They governed the oper-
ation of trains, as and where applicable, over the entire
Rock Island System.  Some of the lines were operated
under the automatic block system; others under the
manual block system; and still others under merely time-
table schedules and train-orders.  As already stated the
Horton line on which the collision occurred was operated
under the manual block system.  A great mass of evi-
dence was introduced at the trial by both sides with
respect to what rules were applicable to the various
phases of train operation under that system and the
proper methods of operating under them.  This evidence,
which consisted of the testimony of brakemen, conduc-
tors, firemen, locomotive engineers, telegraphers and
train dispatchers, most of whom had been in the service
of the railway company for many years, is too volumi-
nous to be set out *in extenso*. On the part of the plaintiff
it tended to show, to put it concretely: that under Rule
332 the operator at Clarksdale, being unable to com-
municate with the operator at Platt River, should have
stopped 1-93 and delivered to it a caution card, in ac-

cordance with which 1-93 would have proceeded under control expecting to find the track obstructed; that 1-93 having on the contrary been given a clear signal, its engineer and conductor were thereby advised, according to Rule 317, not only that the block was clear and they were at liberty to proceed, but that the operator at Clarksdale had communicated with the operator at Platt River and that the latter had displayed a stop-signal to all opposing trains of whatever character and would not admit them to the block until 1-93 reached Platt River and cleared the main line. Furthermore, that it was the duty of the operator at Platt River, he being unable to communicate with Clarksdale, to have stopped 1-98 and given it a caution card, requiring its crew to proceed with their train under control with the expectation of finding the track obstructed.

The defendant's evidence was to the effect: that notwithstanding a clear signal was given 1-98 at Clarksdale, it was the duty of the engineer and conductor of that train not to enter the block unless they had sufficient time to reach Platt River and clear the main line before 12:30, the time when 1-98 was due there; that 1-93 was an inferior train and under rules 87, 88, and 302 it was bound to keep out of the way of 1-98, the superior train; that the engineer of 1-93, if he did not have sufficient time to get to Platt River and off of the main line by 12:30, should either have waited at Clarksdale for 1-98, or have gotten a train order to meet it at Stockbridge; that again after he had entered the block and it became apparent to him that he could not make Platt River by 12:30, he should, under Rule 382, either have taken the intermediate siding at Stockbridge, or protected his train with a flag; and that the engineer and conductor of 1-98 had the right to enter the block at Platt River and proceed on their schedule, even if they knew that 1-93 was in the block, on the assumption that the crew of the latter train would protect itself.

Plaintiff's evidence contra tended to show: that while 1-93 was an inferior train and its engineer and

conductor were required to so operate it as not to trespass on the time of the superior train when it could be avoided, yet, having entered the block under the proper signal, they had the right to proceed to the end of it; that under the rules it was not permissible for them to take an intermediate siding without a train order; that the flag was never used under the block system except to protect the rear of the train; and that the only consequence of encroaching on the time of 1-98 to have been expected by the crew of 1-93 was the infliction of penalties by way of discipline and not a collision of trains.

On December 30, 1916, Ida Stuart, the wife of plaintiff, entered into a written contract with Mr. E. C. Whitsett, as attorney of Kansas City, and now of counsel in this case, which, omitting the formal part, was as follows:

"That on account of William A. Stuart being of unsound mind and not capable of making a contract or attending to business, first party on her own account hereby retains and employs second party to try and adjust a claim of William A. Stuart against Jacob M. Dickinson, Receiver of the Chicago, Rock Island & Pacific Railway Company, for injuries received by him while in the employ of said receiver, on or about June 27, 1915, at or near Platt River station, caused by collision of two freight trains, colliding head-on. Any offer made by the railway company or action taken by second party, is to be subject to the approval of first party, or his guardian, and no steps of any kind are to be taken without such approval; if second party thinks it necessary to file suit on this claim, so as to better carry on negotiations for a settlement of it he may do so and take depositions to prove to the railroad company that it is a good and valid claim; if the suit is filed it is to be brought in the Circuit Court of Jackson County, Missouri, after a guardian is appointed, but second party is to take no other action in connection with said claim unless authorized by first party or a guardian. Second party is to be paid a reasonable fee for settling said claim, but he is to make no charge unless a settlement is made.

"If a settlement cannot be made in a reasonable time then a new agreement will be made and other counsel retained on such terms as may meet with the approval of all parties.

"Second party hereby accepts employment as per the terms above and agrees to use his best endeavors to adjust said claim, but agrees not to settle said claim or take any action except as above stated without the consent of first party or a guardian."

On January 10, 1917, the plaintiff, on the information of his wife, was duly adjudged, by the Probate Court of Grundy County, to be a person of unsound mind and incapable of managing his affairs; she was appointed his guardian, immediately qualified as such and assumed the duties incident thereto. Mrs. Stuart after her appointment as guardian did not enter into a new agreement with Whitsett, but both she and he treated and acted upon the contract of December 30, 1916, as though it had been made by her as guardian, and she never made or had any other agreement with him in any capacity until August, 1917, when a new contract was entered into in which Mr. Madden was retained as additional counsel. Whitsett testified that he never at any time had a conversation with Stuart himself with reference to being employed to prosecute the latter's claim, and there is no evidence to the contrary.

On January 11, 1917, this suit was filed by Whitsett in the Circuit Court for Jackson County, Missouri, in the name of "William A Stuart, a person of unsound mind, by Ida Stuart, his guardian." On February 28, 1917, Whitsett having associated Mr. Horace G. Pope with him as attorney for plaintiff, they filed an amended petition in the cause. On February 10, 1917, the District Court of the United States for the Northern District of Illinois, in which the receivership proceedings were pending, appointed a special master therein, and made an order directing and requirng all person having claims against the railway company, or against the receiver, to submit

such claims for hearing and determination to such special. master, not later than April 10, 1917. The attorney for the receiver caused a notice of his order to be served on Messrs. Whitsett and Pope as attorneys for plaintiff in the suit filed by them in the Circuit Court for Jackson County. Thereupon, on March 7, 1917, Whitsett wrote the special master at Chicago asking for blanks for filing claims against the receiver. In his letter he gave the name of the claimant as William A. Stuart and stated that the claim was for injuries received by Stuart while in the employ of the receiver, as locomotive engineer. He further stated that it was his understanding that the filing of a claim in the receivership proceeding would not interfere with the prosecution of the suit in the Circuit Court of Jackson County, Missouri; that he had no authority to submit his client's rights to any one for determination except a jury. On March 14, 1917, Whitsett and Pope filed a formal claim for William A. Stuart with the special master. This document recited, among other things, that a suit had been instituted against the receiver for the injuries for which claim was therein made in the Circuit Court for Jackson County, Missouri, and a copy of the amended petition filed in the last named court was attached to the claim paper and by reference made a part of it. It was verified by Whitsett, who therein deposed that he was one of the attorneys of record "of said claimant, William A. Stuart." After the filing of the claim nothing further was done with respect to it until the following August, when the attorneys for the receiver and the railway company began to insist that it be set down by the special master for hearing.

In May, 1917, the railway company, its stockholders and the holders of its debentures agreed upon a plan whereby the indebtedness of the company should take the form of new securities which were to be issued and distributed in accordance therewith and all the property of the company thereupon redelivered to it. On June 12, 1917, the plan was approved by the District Court

of the United States, in which the receivership was pending, and by its final decree therein the receivership was lifted, the receiver discharged and the property of the railway company redelivered to it. The decree provided among other things:

"11. That all persons having claims against the railway company or its receivers or receiver (except the holders of bonds secured by mortgage or deed of trust covering any of its subsidiary, affiliated or controlled corporations) not heretofore proved in this cause, be and they are hereby authorized and directed to present and file the same herein not later than July 14, 1917, before said Herbert A. Lundahl, Special Master heretofore appointed herein, for consideration and report by said special master to this court, and that every claim (except that of a bondholder as aforesaid) not filed in this cause on or prior to said July 14, 1917, unless hereafter allowed to be filed by separate order herein by reason of the special conditions appertaining to any such claim, be and it is hereby barred, determined and for naught held, and barred from participating in any way in any of the property of the defendant railway company. . . .

"If the defendant railway company shall refuse on demand to pay any claim which shall have been allowed by the special master without objection, or established by the final order, judgment or decree of this court, the person holding the claim therefor, upon one month's notice to the defendant railway company, or such other notice as the court may direct, may present to this court a petition to have any such claim enforced against the property of the defendant railway company retransferred to it under this decree; and the defendant railway company shall have the right to appeal from the judgment, decree or order made thereon.

"13. That the defendant railway company shall take over and assume the defense of all actions and suits at law or in equity against the defendant railway company and the receivers or receiver herein, or against

either or any of them, or in which they, or any of them,
are or is a party defendant, pending and undetermined
at the date of the entry of this decree, in any court or
tribunal; that the property and assets of the defendant
railway company are to be liable for the amounts of any
judgments eventually obtained in any of such actions
and suits, but the payment of any judgment pending or
which hereafter may be rendered against the railway
company on any cause of action accruing prior to June
25, 1917, shall be subject, however, to such order as this
court shall make in the premises, either by way of
reference to said special master or otherwise, and sub-
ject to the rights of the defendant railway company as
specified in paragraph 11 of this decree.

"16. . . . That the injunction contained in the
orders appointing receivers herein be and is hereby con-
tinued as to all persons, firms and corporations having
claims against the defendant railway company or the re-
ceiver accrued or matured prior to the entry of this
decree, all such persons, firms and corporations being
hereby restrained and enjoined from interfering with,
attaching, levying upon or in any manner whatsoever dis-
turbing any portion of the railroads, property and prem-
ises of which the defendant railway company shall re-
possess itself, by this decree; that jurisdiction hereof is
retained by the court for that purpose and for the pur-
pose of enforcing all the provisions of this decree."

The final report of the receiver, read in evidence in
connection with the record of the proceedings had in the
receivership in the District Court of the United States,
showed that out of the net earnings of the roads while
operated by him he had applied to permanent improve-
ments of the railway company's property sums greatly
in excess of plaintiff's claim.

On August 10, 1917, the special master, Lundahl,
wrote Bird & Pope at Kansas City that the attorneys for
the receiver had requested that the claim of William A.
Stuart be set down for hearing on some day early in
September, and asking them to name a day that would

be agreeable to them.    Thereupon, Whitsett had Mrs.
Stuart come from her home at Trenton to Kansas City
and she was then advised for the first time, according to
her testimony and that of Whitsett, of the filing of the
claim for her husband's injuries with the special master,
appointed by the United States District Court at Chicago
in the receivership proceeding.   She thereupon retained
Mr. T. J. Madden of the Kansas City Bar as additional
counsel, and on August 11, 1917, a letter was sent to
Lundahl, signed by Whitsett, Madden and Bird & Pope
as "attorneys for Mrs. Ida Stuart, Guardian of Wm. A.
Stuart, a person of unsound mind," in which it
was stated that the claim of William A. Stuart
was filed merely to give notice of its existence and
without any intention of submitting it for hearing and
determination; that the persons filing it had no authority
to confer jurisdiction upon the District Court to hear
and determine it; and that it should be considered as with-
drawn.    In reply, Lundahl advised that he had no au-
thority as special master to allow them to withdraw
the claim, and suggested that they make application to
the court for an order dismissing it.   He thereupon set
it down for hearing on October 8, 1917.   On September
29, 1917, Madden served notice on the attorneys for the
receiver and the railway company, on behalf of Mrs.
Stuart as guardian of her husband, that she denied that
the United States District Court had jurisdiction to ad-
judicate the claim, that it was filed in that court with-
out authority, and that she would not appear at the
hearing before the special master.   At the time and place
appointed for the hearing neither the claimant nor any
one for him appeared; the defendant receiver appeared,
however, and the special master proceeded *ex parte* to
hear his evidence.   Upon the hearing the claim was dis-
allowed.   The special master prepared his report to the
court and notified Whitsett and Pope as attorneys for
claimant that it would be filed November 5, 1917.   No
exceptions were filed to the report and it was approved
and confirmed by the court.   In that connection it was
"ordered, adjudged and decreed that the claim of the

said William A. Stuart be disallowed, and that the defendant, the Chicago, Rock Island & Pacific Railway Company and Jacob M. Dickinson, Receiver of the said the Chicago, Rock Island & Pacific Railway Company, be and they are hereby each specially absolved from the payment of any sum or sums on account of the said claim of William A. Stuart, and the property of the said the Chicago, Rock Island & Pacific Railway Company is hereby relieved from the payment of any sum or sums, either directly or indirectly growing out of the said claim of William A. Stuart.''

On or about November 28, 1917, a third amended petition was filed in this cause making the Railway Company a party defendant. No question is raised as to the sufficiency of the petition with reference to its allegations of the negligence relied upon by plaintiff. It charges that plaintiff's injuries were caused by the negligence of the operator at Clarksdale, the negligence of the operator at Platt River and the negligence of the crew of 1-98, all in the respects indicated by plaintiff's evidence as summarized in a preceding paragraph of this statement. The petition further alleges that the railway company, by accepting and reentering into the possession of its property under the final decree of the District Court discharging the receivership, agreed to assume the defense of all actions then pending against the receiver and to pay out of said property all judgments that should be obtained in such actions; and that the receiver, out of the net earnings of the railway system during the period of the receivership, applied to the permanent improvement and betterment of railway company's property a sum far in excess of the amount sued for by plaintiff and by reason thereof said property was returned to the company greatly enchanced in value.

The separate answers of the defendants each contain a general denial, pleas of contributory negligence and assumption of risk, and plead the judgment of United States District Court confirming the special master's report, heretofore set out, in bar of plaintiff's action. The

answer of the railway company pleads in addition the final decree of the District Court discharging the receivership as a further bar to plaintiff's action.

The reply after denying all the allegations of the affirmative defenses pleaded in the answers alleges in effect: first, that the claim filed with the special master was so filed without the knowledge, consent or approval of the plaintiff or his guardian, and that by reason thereof the District Court was without jurisdiction to render the judgment absolving the defendants and the railway company's property from liability for and on account of plaintiff's injuries; second, that said judgment is void for the additional reason that the alleged proof of claim filed with the special master showed on its face that plaintiff was not *sui juris* and that, notwithstanding, no guardian *ad litem* was appointed to act in his behalf.

At the conclusion of plaintiff's evidence in chief and again at the close of the case, each of the defendants requested an instruction in the nature of a demurrer to the evidence. All were refused. On behalf of plaintiff the following instruction numbered 1 was given:

"The court instructs the jury that if you believe and find from the evidence that the manual block system mentioned in evidence, under the rules and practices (if any) of the defendant, Jacob M. Dickinson, receiver, was used for the protection of trains within a block and to prevent collisions between opposing trains in the same block and that each block was under the control of the operators at each end thereof, who communicated with each other by telegraphic signals; and if you further believe and find from the evidence that, under the rules and practices (if any) of said defendant, before a train was admitted to a block the operator at the entrance thereof gave a signal to the next block station in advance asking for the block, and if the block was clear that the operator at the station in advance displayed the stop signal to opposing trains and notified the operator at the entrance of the block to that effect; and that thereupon the opera-

tor at the entrance to such block gave a clear signal to the train desiring to enter the same; and if you further believe and find from the evidence that under the rules and practices (if any) of said defendant such train had the right to thereupon enter and occupy such block and proceed to the opposite end thereof, and that while in said block it would be protected from opposing trains (if you so find); and if you further believe and find from the evidence that the clear signal given by the operator at the entrance to such block implied, under said rules and practices (if any), that such operator had communicated with the operator at the station in advance and had secured the right (if any) for said train to occupy said block and that the stop signal would be displayed to opposing trains at the station in advance and that the train receiving such clear signal would be protected from opposing trains while in such block and until it reached the station in advance; and if you further believe and find from the evidence that under the rules and practices (if any) of said defendant if an operator at the entrance to a block from any cause were unable to communicate with the next station in advance he should stop every train approaching in that direction and not permit any train to enter such block without a caution card 'Form D' and then only when no cause for detaining the train were known (if you so find) and that the operator should not permit any train to enter a block when he knew, or in the exercise of ordinary care could know, that an opposing train was already in such block on its way to his station and that there would be danger of a collision between such trains.

"If, therefore, you believe and find from the evidence that Train 1-93 received a clear signal from the operator at Clarksdale and having received such signal it entered said block then said Train 1-93 had the right to proceed to Platt River station even though it encroached upon the time of Train 1-98, and even though there was a slow order by pink bulletin as mentioned in

evidence; and if you further believe and find from the evidence that plaintiff was injured in the collision mentioned in evidence and that said collision was due to the negligence (if any) of the Clarksdale operator in giving a clear signal to Train 1-93 (if you find he did) and permitting it to enter the block under said signal (if you so find) without having communicated with the operator at Platte River station and securing the block for said Train 1-93 as provided by the rules and practices (if any) of said defendant (if you so find); or to the negligence (if any) of the operator at Platt River station in failing (if you so find) to stop Train 1-98 and permitting it to enter said block when he was unable to communicate with the operator at Clarksdale and when he knew or in the exercise of ordinary care could have known that 1-93 was in said block and on its way to Platte River station and in danger of colliding with 1-98 (if you so find); or to the negligence (if any) of the operator at Platte River station or the train crew in charge of 1-98 in causing or permitting train 1-98 to leave Platte River station in advance of its schedule leaving time (if you find it did) and with an improper order (if you so find) and without being under control (if you so find), then your verdict should be in favor of the plaintiff, providing you find that at the time and place in question, defendant, Jacob M. Dickinson, as receiver, was engaged as a common carrier by railroad in commerce between states, and that plaintiff as his servant was also at said time and place engaged in such commerce on the line of railroad in question and providing you further find that plaintiff's cause of action (if any) is not barred by the proceedings and judgment of the District Court of the United States in Chicago, as defined in other instructions.

"The court further instructs the jury that if you believe and find from the evidence that the defendant, Jacob M. Dickinson, receiver, under the orders and decree of the District Court of the United States at Chicago, Illinois, transferred and surrendered all of the property and rights of defendant company's railway system to

defendant railway company and said defendant railway company received and accepted the same and entered into the possession thereof and assumed the defense of all actions in law or in equity against said receiver and that said railway system and its property was, without sale and foreclosure, redelivered to defendant railway company, including the improvements and betterments of said property which you find from the evidence to have been made to said property under the said receivership (providing you find the same exceeded the sum of $75,-000, the amount sued for in this action), then you will find a verdict against both defendants and in favor of the plaintiff.''

" The jury returned a verdict for plaintiff assessing his damages at a substantial sum and judgment was given accordingly.

Defendants appeal.

While numerous exceptions were saved to the rulings of the trial court on the admission of evidence and those exceptions were preserved in the motion for a new trial, they were not referred to in the oral argument, nor are they mentioned in the briefs filed here; they will therefore be treated as abandoned. Alleged errors in refusing instructions asked by defendants and in giving the instruction hereinbefore set out for plaintiff are relied upon for a reversal of the judgment. Appellants contend that the court should have directed a verdict for each of them on these grounds: (1) the plaintiff was estopped by the judgment of the United States District Court, rendered on the special master's report, from further prosecuting the action; (2) the final decree of that court in discharging the receivership absolved the property of the railway company from liability for or on account of plaintiff's claim; and (3) plaintiff's own negligence was the proximate cause of his injuries. We will consider these in the order named.

I. In avoidance of the judgment of the United States District Court disallowing his claim, respondent by his

290 Mo.—35

pleading and evidence endeavored to show that his alleged appearance in that court was unauthorized and for that reason the court was without jurisdiction and the judgment a nullity. Appellants find no fault with respondent's pleading with respect to this phase of the case and they seem to concede that there was sufficient evidence to take the case to the jury on the question of whether Whitsett and Pope were authorized to file the claim in the District Court. But they do contend that the judgment of that court, being valid on the face of the record, can not be thus collaterally attacked.

Judgment of Federal Court: Collateral Attack.

It has long been the rule in this State that a domestic judgment can not be assailed collaterally on the ground that it was rendered upon the unauthorized appearance of an attorney (Cochran v. Thomas, 131 Mo. 258; Scott v. Royston, 223 Mo. 568, 594); although, as pointed out in Scott v. Royston, the tendency of recent decisions in many jurisdictions is to establish the doctrine that any judgment resting on an unauthorized appearance is absolutely void. The judgment in question, however, is not a domestic judgment. It is a judgment of a United States District Court sitting in the State of Illinois and, as to its attributes now under consideration, it stands upon the same footing as the judgment of a court of a sister state. [Cooper v. Newell, 173 U. S. 555, 566, 567.] Appellants have not pointed out any controlling decision of this court, holding that such a judgment, when effect is sought to be given it in the courts of this State, may not be challenged on the ground that the court that rendered it was without jurisdiction. It is true that in the early case of Warren v. Lusk, 16 Mo. 102, it was held that under the "full faith and credit" clause of the Constitution and the Act of Congress passed pursuant thereto, in a suit on a judgment of another state, no plea could be set up against it that was inadmissible in a suit on a similar judgment of this State. This case was overruled, however, in Marx v. Fore, 51 Mo. 69, in which it was held that the judgments

of other states are just as conclusive as domestic judgments with this exception, that they are open to inquiry as to the jurisdiction of the court and notice to the defendant, and this inquiry can be made notwithstanding the recitals. The question considered in that case was whether, when suit is brought on a judgment of another state, such judgment may be attacked and the want of jurisdiction and a simulated appearance be shown by answer, or whether the party who is sued upon it is compelled to go to the state where it was rendered and there proceed directly to overthrow it. It was held that "citizens are not driven to foreign states to protect their rights. If they have a legal right, or are being subjected to a wrong, they may look for protection to the tribunal having jurisdiction over them and the subject-matter, if the opposite party has placed himself within this jurisdiction." It was further held that the facts showing want of jurisdiction might be set up in the answer, that under our code such pleading would be equivalent to a direct action by a bill in equity to set aside the judgment. Subsequent decisions disregarded this refinement, however, and in a general way followed the doctrine established by the decisions of the Supreme Court of the United States and of practically all the state courts to this effect: neither the constitutional provision that full faith and credit shall be given in each state to the public acts, records and judicial proceedings of every other state, nor the act of Congress passed in pursuance thereof, prevents an inquiry into the jurisdiction of the court by which a judgment offered in evidence was rendered, and accordingly when a judgment recovered in one state is pleaded or presented in the courts of another state, whether as a cause of action or a defense or as evidence, the party sought to be bound or affected by it may always impeach its validity and escape its effect by showing that the court which rendered it had no jurisdiction over the parties or the subject-matter of the action. And the recitals in the record of any such judgment, on the subject of jurisdic-

tion, may be controverted by extraneous evidence. [Napton v. Leaton, 71 Mo. 358; Eager v. Stover, 59 Mo. 87; Barlow v. Steel, 65 Mo. 611; Bradley v. Welch, 100 Mo. 258; Hays v. Merkle, 67 Mo. App. 55; Banister v. Weber, Gas Co., 82 Mo. App. 528; Hester v. Frink, 189 Mo. App. 40, 45; Thompson v. Whitman, 18 Wall. 457; Cooper v. Newell, supra; Brown v. Fletcher's Estate, 210 U. S. 1. c. 88; Kilbourn v. Thompson, 103 U. S. 168, 197, 198.]

Lieber v. Lieber, 239 Mo. 1, cited by appellants, is not out of harmony with the doctrine just stated. In that case a decree of divorce rendered in the State of Illinois was attacked on the ground that the court's jurisdiction rested upon a false affidavit and perjured testimony. It was claimed that the affidavit of non-residence of the defendant, on which the order of publication was based, and the plaintiff's testimony that he had resided in Illinois the requisite length of time to enable him to bring the suit under the statute of that state, were untrue in fact. These facts, the residence of the plaintiff prior to instituting the suit and the non-residence of the defendant, had to be alleged and proved before the court could entertain jurisdiction to hear the cause. Their existence was, therefore, necessarily determined by the court and such adjudication we held was invulnerable to collateral attack. The case is clearly illustrative of the well recognized distinction between those facts which involve jurisdiction over the parties and subject-matter and those *quasi*-jurisdictional facts, without the allegation of which the court cannot properly proceed, and without proof of which a decree should not be made; absence of the former renders the judgment void and assailable collaterally, but the existence of the latter, with some exceptions (Wagoner v. Wagoner, 287 Mo. 567), cannot be inquired into in a collateral proceeding.

In accordance with the rule heretofore stated, with respect to the judgments of other jurisdictions, the judgment of the United States District Court in question was subject to challenge in this cause by the plaintiff on the

ground that the institution of the proceedings in that court, which culminated in the judgment, was unauthorized by him.

II. (1). The final decree discharging the receivership contains a provision absolving the property of the railway company, after its return to the company, of liability in respect to all claims against the receiver not filed with the special master for hearing and determination on or before a designated date, and through a subsequent provision the court attempts to retain jurisdiction to enforce the former one. The decree (prepared no doubt by skillful counsel) was artfully drawn, but the situation with which it dealt was not a whit different from that described in Railway v. Johnson, 151 U. S. 81, 1. c. 102, and the reasoning of the Supreme Court in that case, in passing upon the validity and effect of a similar decree, can with equal propriety be applied in this:.

*Forestalling Further Litigation.*

"In this connection it should be observed that the property was not sold but merely redelivered to the company. No judgment *in rem* was entered; no fund existed through a sale in foreclosure; the earnings far exceeded the debts during the temporary management; and it did not appear that either in reference to expenses incurred in the administration or in the matter of claims resting on controverted priorities, or otherwise, there were any equities to be adjusted which required the further exercise of jurisdiction. . . .

"The general equity jurisdiction of the circuit court no doubt embraced the authority to hold possession of the property and to determine the rights of all persons who were parties, or who made themselves parties, to the proceedings before it; and if the property sequestrated had gone to sale and a fund been realized for distribution, then, upon notice appropriate to proceedings *in rem*, the defendant in error might have been bound by the disposition thereupon made. . . .

"Certainly the preservation of general equity jurisdiction over suits instituted against receivers without

leave does not, in promotion of the ends of justice, make it competent for the appointing court to determine the rights of persons who are not before it or subject to its jurisdiction; and the right to sue without resorting to the appointing court which involves the right to obtain judgment, cannot be assumed to have been rendered practically valueless by this further provision in the same section of the statute which granted it."

One cannot read the decree without coming to the conclusion that the sole purpose of inserting therein the provisions above referred to was to deprive all persons having claims against the receiver of the right to sue on them in the state courts, if they so elected; in any event that was their necessary effect and they could serve no other purpose whatever. It must be held, therefore, that those provisions of the decree are not binding on respondent, if his appearance in the District Court was unauthorized. [Smith v. Lumber Co., 200 Fed. 647; Railroad v. Hulbert, 205 Fed. 248; Railway v. Bloom, 164 U. S. 636; Gableman v. Railway, 179 U. S. 335.]

(2). The railway company contends that a personal judgment cannot be rendered against it. This, because the alleged wrong causing plaintiff's injury was committed by the receiver while he was operating

**Personal Judgment.** the road, and under the final decree it assumed and became bound to pay only such claims against the receiver as were filed with the special master and established in accordance with its terms. All of this is true, but it does not dispose of the company's liability. The record evidence shows conclusively that the receiver, out of the earnings of the roads during his management, not only paid current operating expenses, but applied to permanent improvements of the property sums which in the aggregate greatly exceeded the amount of plaintiff's claim. The claim, if valid, was payable out of the earnings in the receiver's hands; he, instead, put them into betterments and the property thus enhanced in value was returned to the company. Independently of the decree, and under general equitable principles, the

plaintiff has a right to follow the fund and have the property into which it has gone charged with the payment of his claim, when established. But on the facts conclusively shown by the record no right or advantage would accrue to the railway company by compelling the plaintiff to resort to such an equitable proceeding. Whether judgment for the amount of his claim be rendered against it generally, or whether such amount be made merely a charge against its property, cannot make the slightest difference to the company. In either event the consequences to it would be precisely the same. Under such circumstances the rendition of a personal judgment has been held not to be improper. [Railway v. Bloom, supra.]

(3). The receiver's demurrer to the evidence should have been sustained. "It is well settled law that suits against a receiver are in effect only against the receivership; he being regarded as in the nature of a corporation sole. Such suits are against the funds in his hands. His contract, misfeasances and negligence (apart from personal misconduct or personal negligence) are official, not personal; judgments against him are payable only from the property or money in his hands, and his discharge as receiver absolutely puts an end to his liability." [Smith v. Lumber Co., supra, l. c. 650, and cases cited.] Respondent suggests that the continuance of the receiver as a party defendant, notwithstanding his discharge, is proper because the effect and validity of the judgment rendered by the District Court in his favor and against plaintiff is at issue. If this were a direct action to set aside that judgment the position might be tenable, but in this proceeding the judgment can be just as effectually interposed as a defense by the railway company on the one hand and its validity assailed by the plaintiff on the other without as with the receiver being a party.

**Receiver as Party.**

III. Appellants finally insist that the court should have directed a verdict in their favor because plaintiff's

Proximate
Cause.

evidence shows as a matter of law that his negligence was the proximate cause of his injury.

The acts of negligence on which plaintiff relies are the violations of the rules of the company: (1) by the operator at Clarksdale in giving a signal which not only indicated that the block was clear, but that he had communicated with Platt River and that a stop signal against opposing trains was displayed there, whereas, not having communicated with Platt River, he should have given plaintiff a caution card directing him to proceed with caution and expect to find the block obstructed; (2) by the operator at Platt River in giving 1-98 a clearance card in which it was stated that "1-93 may be in the block," whereas, not having communicated with Clarksdale, he should have stopped 1-98 and given it a caution card; and (3) by the crew of 1-98 in leaving Platt River ahead of its schedule and then proceeding without having their train under control when they were warned that 1-93 might be in the block.

Conceding that there was evidence tending to establish these acts of omission and commission, violative of the rules on the part of the signalmen at Clarksdale and Platt River and the train crew of 1-98, the appellants assert that such acts, singly or combined, did not operate as the proximate cause of the collision. Their argument is to this effect: If the Clarksdale operator had communicated with Platt River, he would have displayed to 1-93 a clear signal just as he did do, because the block was in fact clear; the plaintiff was not misled by the signal because he knew that, notwithstanding a clear signal was displayed at his end of the block, 1-98, if on its schedule, would enter the block from the opposite direction at 12:30, regardless of where his train was, and it was his duty to keep out of its way; if a caution card had been given plaintiff instead of the clear signal, it would have added nothing by way of information or warning with respect to the precautions required of him by the rules, because he knew long before he encountered

1-98 that he could not reach the end of the block and clear the main line by 12:30 and that his train was in imminent danger unless he took measures to protect it. If, at the time 1-98 approached Platt River, the operator there had communicated with Clarksdale, he would have given 1-98 a clearance card, just as he did, except that he would have written on it "1-98 *is* in the block" instead of "*may be*" in the block; and with a card in either form the crew of 1-98 would have had the right to proceed into the block just as they did on the assumption that 1-93 would get out of the way or protect itself. Even if 1-98 left Platt River ahead of its schedule, according to the evidence most favorable to plaintiff, the time to the extent of which the schedule was anticipated was too short for 1-93 to have reached that station and gotten on the siding before 12:30. The failure of the Platt River operator to stop 1-98 and give it a caution card was not a factor in the situation, because the block was not in fact obstructed, except by 1-93, which under the rules, was not an obstruction to a superior train. The cause of the collision, therefore, was the failure of the plaintiff to keep his train out of the way of a superior train as the rules required him to do. Knowing that he had only 22 minutes to make the run from Clarksdale to Platt River, when the regular schedule required 30 minutes, he should either have not entered the block, or else have gotten a train order to meet 1-98 at Stockbridge; and afterward, as he was proceeding toward Platt River, when it became apparent that he could not reach the end of the block and clear the main line before 12:30, he should have taken the intermediate siding, or, if too late to do that, have protected his train with a flag.

Assuming that appellants have correctly construed the rules, still there were questions for the jury. Plaintiff's train was about six hours late at Clarksdale; he had the right to make up time whenever he could; there was evidence tending to show that he could reasonably have expected to make the run of eleven miles to Platt River in 18 or 20 minutes; he made the first seven miles to

Stockbridge in 12 minutes and he had ten minutes to complete the run of something less than four miles to the switch about a quarter of a mile east of Platt Riper station where he could leave the main line. Under all the circumstances it was for the jury to say whether he was negligent, either in leaving Clarksdale when he did, or, having done so, in not taking the siding at Stockbridge.

Again, the jury could have well found from the evidence that the crew of 1-98 were warned before they left Platt River station that 1-93 might be in the block; that they knew that according to the rules 1-93 could not take the siding at Stockbridge without a train order; that they also knew that no such order had been made because, if it had been, a copy would have been delivered to them at St. Joseph or Platt River; that under such circumstances it was their duty to have proceeded with their train under such control that they could have stopped upon coming in view of 1-93 or its flag in time to have avoided a collision; that they did not so proceed, but on the contrary left Platt River ahead of their schedule, immediately increased their speed after leaving that station and ran around a curve, where only a short stretch of track just ahead was visible, at the rate of thirty miles an hour; that in so doing they were guilty of negligence of the grossest character; and that such negligence was the proximate cause of plaintiff's injury.

In any event it was for the jury to determine whether negligence on the part of plaintiff, or on the part of the signalmen, or on the part of the crew of 1-98, or whether any of the alleged acts of negligence, was the proximate cause of the collision and the resulting injury.

IV.   Appellants complain of plaintiff's instruction numbered 1 on the grounds: first, that it assumed as true all the matters and things set out in its first **Erroneous Instructions.** paragraph; and, second, that its third paragraph, being wholly disconnected from what precedes it, was equivalent to a peremptory instruction to the jury to find for the plaintiff.

1. The first paragraph is a sort of preamble in which is consecutively set forth the uses and purposes of the manual block system, the performance by the signalmen of their several functions and the rights and duties of the operators of trains with respect to entering and passing through a block—"under the rules and practices" of the defendant receiver. Each part of it dealing with a separate phase of operation is prefixed with an "if you find" or "if you further find," but the paragraph ends with a period, and the next begins with "If, therefore," apparently assuming that all the things previously stated hypothetically were true, or at least that the jury must necessarily find them to be true. Assuming that to have been the effect of the instruction, was it for that reason error to have given it?

A great deal of testimony was received ostensibly for the purpose of showing the methods of operating trains under the rules, but as a matter of fact it took a much wider scope, going in effect to the meaning of the rules themselves as understood by the witnesses. The rules in question, however, constituted a written contract between the receiver and his employees; their construction, therefore, devolved exclusively upon the court. [3 Labatt's Master and Servant (2 Ed.) sec. 1121.] And the question of whether Instruction No. 1 was erroneous in the respect under consideration depends largely on whether or not its assumptions are in harmony with the rules correctly construed.

A reading of the rules governing the manual block system used by the receiver makes it clear that the essential and controlling protective features of that system were provided by Rule 317 and that the other rules dealt with situations that are more or less incidental or exceptional in train operation. Rule 317 provides for both opposing and following movements. According to its provisions *to admit a train to a block* the signalman must examine the block record and, if the block is clear, call the next station in advance and request the signalman

there to display a stop signal; the latter signalman, if the block is clear, must display a stop signal to opposing trains and reply that the stop signal is displayed; and the signalman at the entrance of the block must then display the signal indicating that the block is clear. These are the clearly prescribed conditions on which a train from either direction may be admitted to a block; and a clear signal at the entrance of the block necessarily implies that all of the conditions have been met—that not only is the block clear, but that a stop signal against opposing trains is displayed at the other end. Notwithstanding these plain and explicit provisions of Rule 317, appellants contend that after a freight train has been admitted to a block in strict conformity with their requirements a superior train of the same class may enter the block from the opposite direction in total disregard of the stop signal displayed there. In support of their contention they cite rules 87, 88, 302 and 382. Rules 87 and 88 in effect declare that an inferior train must keep out of the way of opposing superior trains; Rule 302 says that "block signals control the use of blocks, but unless otherwise provided, do not supersede the superiority of trains;" and Rule 382 provides that "a superior train (in either direction) will be permitted to enter the block under block restrictions." To give unrestrained effect to the language of these rules, according to its literal import, is to nullify Rule 317 and destroy the essential features of the manual block system. Under the rules as so construed the system affords protection to passenger trains only, because regular time-table freights must rely solely on the schedules, except when aided by a train order, and extras apparently move only on train orders in any event. Evidently the receiver thought when he adopted these rules that each of them could be given effect without violating any of the others; they should, therefore, be so construed, if possible.

Rules 87 and 88 were general rules applicable over the entire Rock Island System—both where block sys-

tems were in use and where they were not. They em-
bodied what has been called a fundamental principle of
railroad operation, and by Rule 302 the principle was rec-
ognized and retained as a continuing one under the man-
ual block system. But if its application, as directed by
rules 87 and 88, was in no way modified or restrained by
the adoption of the block system, of what avail was that
system? What additional measures of safety did it bring
to the dangerous service. It seems more reasonable to
construe Rule 302 as meaning that block signals control
the use of blocks absolutely, in the sense that such signals
cannot be ignored and rights accepted under them can-
not be disregarded, but that train operatives in accepting
the use of blocks under the signals must do so with due
regard to the rights of superior trains. In other words,
when a signal is displayed to an inferior train indicating
that the block in advance is clear, such train may accept
the block, and, having done so, it will be protected from
opposing trains by the stop signal displayed at the other
end until it reaches that point, but an inferior train
should not accept a block when, by doing so, it will en-
croach upon the time of a superior train. Under Rule
318 a freight train may be permitted to follow a freight
train into a block with a "block restriction card." The
language of Rule 382 that "a train accepting a signal to
proceed to the next block station on its schedule or right,
and failing to do so, must take an intermediate siding or
protect itself as prescribed by Rule 99," when read in
connection with 318 and other rules, must be construed
as providing protection against following trains only.
In front, a train is not only protected by the stop signal
displayed at the block station in advance, but under Rule
381 no other train is permitted to meet or pass it at an
intermediate siding without a train order. The last sen-
tence in Rule 382, "a superior train (in either direction)
will be permitted to enter the block under block restric-
tions," evidently means that a superior train will be per-
mitted to enter a block occupied by an inferior train; if

going in the same direction, with a caution card; and if coming from the opposite direction, under a train order to both to meet or pass at an intermediate siding. This construction of the rules just mentioned seems more reasonable than the one contended for by appellants, in view of the ends sought to be attained by the rules as a whole, namely, the safety of those engaged in operating trains and expedition in the handling of traffic. But if those rules are fairly subject to either of the two constructions, under the circumstances of this case, the one most favorable to the plaintiff should be adopted, because it was the duty of the receiver to have made and enforced rules sufficiently clear and specific as to be capable of being intelligently understood and obeyed by his employees. [3 Labatt's Master & Servant (2 Ed.) 1122.]

Returning to plaintiff's instruction number 1, we find that it assumed in effect that the manual block system was in use by the receiver (the case was tried on that theory by both sides), and that it was the duty of the signalmen and train operators to discharge their several functions thereunder in accordance with the provisions of the rules as we have construed them. These assumptions did not render the instruction erroneous.

2. The third paragraph of the instruction told the jury, in effect, that if they found that the property of the railway company was returned to it by the receiver without sale or foreclosure, with improvements and betterments exceeding in value $75,000, they should return a verdict for the plaintiff. There is no reference in this paragraph to anything that precedes it, nor is there any reference any where in the preceding paragraphs to it. In both form and contents it is wholly disconnected with anything that precedes or follows it. The first and second paragraphs purported to be, within themselves, a complete instruction; they submitted to the jury a state of facts, which, if found by them, authorized a verdict "in favor of the plaintiff." The third paragraph without reference to them submitted another and wholly in-

Stuart v. Dickinson.

dependent state of facts and told the jury that if they found them, without anything more, they should find "a verdict against both defendants and in favor of the plaintiff." The facts submitted in the last paragraph were not controverted; the direction to return a verdict for plaintiff if they were found was, therefore, tantamount to a peremptory instruction. It was no doubt the intention of counsel in preparing the instruction that it should convey to the jury the direction, that if they found the facts under the first and second paragraphs they should return a verdict for plantiff against the defendant receiver, and if, in addition to that finding, they also found the facts specified in the last paragraph, they should return a verdict for plaintiff against both defendants. But we are unable to reach the conclusion that the jury necessarily, or even probably, understood that they were required to find for plaintiff under the first and second paragraphs of the instruction before they could find for him under the third, in the face of the plain import of the language of the latter. With reluctance, we feel constrained to hold that the third paragraph of the instruction was so misleading, if nothing more, as to necessitate a reversal of the judgment.

Some other questions are raised by appellants but they are not deemed of sufficient merit to justify extending for their consideration an opinion already too long.

For the error noted the judgment is reversed and the cause remanded. *Small, C.,* concurs; *Brown, C.,* absent.

PER CURIAM:—The foregoing opinion of RAGLAND, C., is adopted as the opinion of the court. *James T. Blair, C. J., Graves, Higbee* and *D. E. Blair, JJ.,* concur; *Elder, J.,* concurs in the result; *Walker* and *Woodson, JJ.,* dissent.