## ELGIN, JOLIET & EASTERN RAILWAY CO. *v.* BURLEY ET AL.

No. 160, October Term, 1944. Reargued December 3, 4, 1945.— Decided March 25, 1946.

*Paul R. Conaghan* argued the cause and filed a brief for petitioner.

By special leave of Court *Robert L. Stern* argued the cause for the United States, as *amicus curiae*. With him on the brief was *Solicitor General McGrath*.

*John H. Gately* argued the cause and filed a brief for respondents.

Briefs were filed as *amici curiae* by *Ray T. Miller, Wayland K. Sullivan, Harold N. McLaughlin* and *W. A. Endle* for the Brotherhoods of Locomotive Engineers and Trainmen; by *Harold C. Heiss, Russell B. Day* and *V. C. Shuttleworth* for the Brotherhood of Locomotive Firemen and Enginemen et al.; and by *Lee Pressman, Eugene Cotton, Frank Donner, Willard Y. Morris, William Standard, David Scribner, Leon M. Despres, John J. Abt, Isadore Katz, M. H. Goldstein* and *Ben Meyers* for the Congress of Industrial Organizations et al., in support of petitioner.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

We adhere to our decision rendered in the opinion filed after the first argument. 325 U. S. 711.[1] That opinion

---

[1] The petition for rehearing, which resulted in setting the case for reargument, was supported by motions filed amicus curiae by various labor organizations and by the office of the Solicitor General. Upon granting of the motions, those organizations and the Solicitor General filed briefs amicus curiae and the latter participated in the argument. Various positions were taken upon the merits which we have considered but do not find it necessary to set forth.

expressly refrained from undertaking to make a definitive statement of what might be sufficient evidence of the collective agent's authority either to settle finally the aggrieved individual employee's claims or to represent him exclusively before the Adjustment Board. We do not attempt to do so now. For whether the collective agent has such authority is a question which may arise in many types of situations involving the grievances either of members of the union or of nonmembers, or both, and necessarily therefore no all-inclusive rule can be formulated for all such situations. But neither does this mean that an equally all-exclusive rule must be followed, namely, that authority can be given or shown only in some particular way.

The question whether the collective agent has authority, in the two pertinent respects, does not turn on technical agency rules such as apply in the simple, individualistic situation where P deals with T through A about the sale of Blackacre. We are dealing here with problems in a specialized field, with a long background of custom and practice in the railroad world. And the fact that § 3 First (i) provides that disputes between carriers and their employees arising out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions "shall be handled in the usual manner" up to and including the chief operating officer of the carrier, indicates that custom and usage may be as adequate a basis of authority as a more formal authorization for the union, which receives a grievance from an employee for handling, to represent him in settling it or in proceedings before the Board for its determination.[2]

---

[2] Furthermore, so far as union members are concerned, and they are the only persons involved as respondents in this cause, it is altogether possible for the union to secure authority in these respects within well established rules relating to unincorporated organizations and their relations with their members, by appropriate provisions in

Moreover, when an award of the Adjustment Board involving an employee's individual grievance is challenged in the courts, one who would upset it carries the burden of showing that it was wrong.[3]  Its action in adjusting an individual employee's grievance at the instance of the collective bargaining agent is entitled to presumptive weight.  For, in the first place, there can be no presumption either that the union submitting the dispute would undertake to usurp the aggrieved employee's right to participate in the proceedings by other representation of his own choice, or that the Board knowingly would act in disregard or violation of that right.  Its duty, and the union's, are to the contrary under the Act.[4]

Furthermore, the Board is acquainted with established procedures, customs and usages in the railway labor world. It is the specialized agency selected to adjust these controversies.  Its expertise is adapted not only to interpreting a collective bargaining agreement,[5] but also to ascer-

---

their by-laws, constitution or other governing regulations, as well as by usage or custom.   There was nothing to the contrary in our former opinion.   We only ruled that on the showing made in this respect, which included controverted issues concerning the meaning and applicability of the union's regulations, and the effects of custom and usage, we could not say as a matter of law that the disputed authority had been given.

[3] In a somewhat different connection, which however we think not without weight here, § 3 First (p) provides that the Board's award "shall be prima facie evidence of the facts therein stated" in the statutory suit provided for enforcement of awards.

[4] The contrary practice noted in our former opinion, 325 U. S. 732–733, has been due without question, we think, to the Board's erroneous conception, accepted generally also by the unions and strongly urged in this case especially upon the reargument, that the Act itself, notwithstanding the provisions particularly of § 3 First (j) and the proviso to § 2 Fourth, confers exclusive statutory power upon the collective agent to deal with the carrier concerning individual grievances and to represent the aggrieved employee in Board proceedings.

[5] We recently emphasized this in *Order of Railway Conductors* v. *Pitney*, 326 U. S. 561, 567, in which we said: "Since all parties seek

taining the scope of the collective agent's authority beyond what the Act itself confers, in view of the extent to which this also may be affected by custom and usage.

We also pointed out that the Act imposes correlative affirmative duties upon the carrier, the collective agent and the aggrieved employee to make every reasonable effort to settle the dispute.[6] It would be entirely inconsistent for the Act to require the carrier and the union to negotiate concerning the settlement of the grievance and, while withholding power from them to make that settlement effective finally as against the employee, to relieve him altogether of obligation in the matter. Not only is he required to take affirmative steps. His failure to do so may result in loss of his rights.[7]

It is not likely that workingmen having grievances will be ignorant in many cases either of negotiations conducted between the collective agent and the carrier for their settlement or of the fact that the dispute has been submitted

to support their particular interpretation of these agreements by evidence as to usage, practice and custom, that too must be taken into account and properly understood. The factual question is intricate and technical. An agency especially competent and specifically designated to deal with it has been created by Congress."

[6] See 325 U. S. 711 at notes 12, 18 and text. We said: "The obligation [to negotiate] is not partial. In plain terms the duty is laid on carrier and employees alike, together with their representatives; and in equally plain terms it applies to all disputes covered by the Act, whether major or minor." Note 18. Cf. *Virginian R. Co.* v. *System Federation,* 300 U. S. 515, 548; *Railroad Trainmen* v. *Toledo, P. & W. R. Co.,* 321 U. S. 50, 56 ff.

[7] Even the ordinary law of agency attributes authority to a representative to act when the principal stands by with knowledge or notice of his assumption of that authority and permits the third person to act to his injury upon the same assumption. Cf. Seavey, The Rationale of Agency (1920) 29 Yale L. J. 859, 873 *et seq.;* and other authorities cited in Mechem, Cases on the Law of Agency (3d ed.) 186, note. And of course the assumption that even so-called common law rules of agency allow no room for the play of usage and custom is, to say the least, naive.

by one or the other to the Adjustment Board for determination. Those negotiations, as the Act requires, are conducted on the property. § 2 Sixth. Ordinarily submissions are not, and the statute contemplates that they shall not be, made to the Board until after all reasonable efforts to reach an agreement have been exhausted in good faith.[8]

In view of these facts there cannot be many instances in which an aggrieved employee will not have knowledge or notice that negotiations affecting his claim are being conducted or, if they fail, that proceedings are pending before the Board to dispose of it.[9] Although under our ruling his rights to have voice in the settlement are preserved, whether by conferring with the carrier and, having seasonably done so, refusing to be bound by a settlement reached over his protest, or by having representation before the Board according to his own choice, we did not rule, and there is no basis for assuming we did, that an employee can stand by with knowledge or notice of what

---

[8] Cf. note 6 and authorities cited.

[9] We pointed out in the former opinion that § 3 First (j) expressly provides that "the several divisions of the Adjustment Board shall give due notice of all hearings *to the employee* or employees and the carrier or carriers involved in any dispute submitted to them," 325 U. S. at 731, 734, and this provision, with the emphasis we placed upon the phrase "to the employee" and the conjunction of the provision for "due notice" with the provision for representation "in person, by counsel, or by other representatives," was one of the statutory mainstays for our conclusion that the Act did not give the collective agent the exclusive powers over the settlement of grievances claimed for it.

But we did not undertake to define what was meant by "due notice," nor do we now. "Due notice" conceivably could be given or had in a variety of forms, more especially when account is taken of the generally informal procedure of the Board. It would require at the least, we think, knowledge on the aggrieved employee's part of the pendency of the proceedings or knowledge of such facts as would be sufficient to put him on notice of their pendency.

is going on with reference to his claim, either between the carrier and the union on the property, or before the Board on their submission, allow matters to be thrashed out to a conclusion by one method or the other, and then come in for the first time to assert his individual rights. No such ruling was necessary for their preservation and none was intended.

It may be, as we said previously, that respondents upon the further hearing will find it difficult to sustain their allegations, whether with reference to knowledge or notice in the material respects concerning which they have denied having it or otherwise. But whether this burden will be easy or impossible to carry, they are entitled to undertake it in the forum where such issues properly are triable.

The judgment is affirmed and the cause is remanded for further proceedings consistent with this opinion and the previous opinion filed in this cause.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case on the reargument.

MR. JUSTICE FRANKFURTER, dissenting.

The CHIEF JUSTICE, MR. JUSTICE BURTON, and I are of opinion that the judgment should be reversed. Last Term a divided Court held that a determination by the Adjustment Board of a dispute brought before it by a union recognized as the collective bargaining agent on behalf of its members is not binding, and may be upset in a district court in an independent suit involving the construction of the collective agreement, but brought by an individual member on his own behalf. 325 U. S. 711. The dissent expressed the view that "to allow such settlements to be thus set aside is to obstruct the smooth working of the Act. It undermines the confidence so indispensable to adjustment by negotiation, which is the vital object of the Act." *Id.* at 755–56.

The Court now announces that it "adheres" to its decision. But as we read the Court's interpretation of its original opinion, it "adheres" to it by extracting from it almost all of its vitality. We say "almost" because the one thing that remains is the conclusion that the determination by the Adjustment Board that the recognized union represented its members is allowed to be reopened not before the Board but anew in the courts, State or federal, in an independent suit by a member of the union against the carrier. To be sure, the prospects for redetermination are largely illusory because the Court now erects a series of hurdles which will be, and we assume were intended to be, almost impossible for an employee to clear. But since litigation is authorized and hope springs eternal in a litigant's breast, the far-reaching mischief of unsettling non-litigious modes of adjustment under the machinery of the Railway Labor Act largely remains. When peaceful settlements between carriers and the Brotherhoods are subject to such hazards, the carrier can hardly be expected to negotiate with a union whose authority is subject to constant challenge. It was this dislocation of settled habits in adjusting railroad labor relations which evoked a series of petitions for rehearing from the United States, the Brotherhoods, the Railway Labor Executives' Association, and the organizations of industrial and craft unions. All the interests primarily concerned and best informed on these matters were aroused because for them the opinion destroyed the capacity of the Railway Labor Act to fulfill its function, ignored the normal practices of the industry, and impaired the rights of collective bargaining generally. Because of this unsettling effect, not abated by the present decision's adherence to the prior by adding new complexities—complexities so inimical to healthy relations on the railroads—we deem it appropriate to add to what was said in the original dissent. 325 U. S. 711, 749.

That these mischiefs are real and potent is attested by the arguments presented by the *amici curiae*. The United States points out:

> "The result of last Term's decision has been and will be that a union's authority to settle a grievance involving a claim for accrued damages will always be subject to challenge by an individual who does not get all he wants, unless the union has previously obtained an exceedingly explicit power of attorney to act on his behalf. This means that the carriers will be likely to demand proof of such authorization from every individual involved before undertaking to negotiate a grievance case, since they might otherwise be liable to any employee dissatisfied with the settlement. As we shall see, this has been what has happened on the Adjustment Board.
>
> In many simple cases, of course, it will not be difficult for the organization to secure an authorization. In other types of cases, although many authorizations could probably be obtained, it might be impossible to obtain authority from every individual involved. And whether or not impossible, the process of securing necessary authorizations might be so prolonged as to prevent prompt disposition even of the many cases which would in the past have been speedily settled on the properties."

The Brotherhoods of Locomotive Engineers' and of Railroad Trainmen thus summarize the effect of the Court's decision:

> "The impact of the Court's decision on the processes of grievance adjustment has already appeared in the suspension of the functioning of the National Railroad Adjustment Board and in indicated difficulties on various railroad properties. It is our conviction that unless this decision be reversed or substantially modified, the prompt and orderly settlement of such disputes will be impeded to a serious degree. The holding upsets long established techniques of grievance handling by employee represent-

atives and adversely affects the administration and enforcement of the collective agreements.

We point out, first, that the Court's decision construes the Railway Labor Act in a way which frustrates the purposes which Congress had in mind in providing for the settlement of grievance disputes."

"The shutting down of the Adjustment Board because of the difficulty or the impossibility of securing authorizations is only one development of the decision. We are advised that some managements are insisting that local chairmen furnish powers of attorney in day to day adjustments. Considering the various factors involved, such as the volume of the grievances, the extra burden placed on the committees, and the additional delays which would be encountered, the task of compliance with the technique required by the Court's decision seems calculated to cause a breakdown of grievance handling by employee representatives. It is obvious that handling by individuals or on an individual basis will not work. Such a breakdown, or even the impairment of collective handling as traditionally practiced, will be serious, as prior history shows."

"Second, the decision impairs the functioning of employee representatives under the Act, and has an adverse effect upon the maintenance of craft agreements. Representatives of employees have the statutory right and duty (1) to confer with management respecting *all* disputes (§ 2 Second) and specifically those arising out of grievances or out of the interpretation or application of agreements (§ 2 Sixth); and (2) to represent a craft or class for the purposes of the Act (§ 2 Fourth). The latter, of course, includes the right to negotiate craft agreements. Employees, acting through representatives, have the right to make and maintain agreements and to settle *all* disputes (§ 2 Fourth, § 1 First). These provisions, we believe, spell out collective bargaining rights with which the Court's decision interferes."

The Railway Labor Executives' Association and the American Federation of Labor make this analysis:

"In summary, therefore, we submit that the regulatory scheme of the Railway Labor Act requires for its effective operation a recognized authority in the collective bargaining representative to proceed in its own right to adjust disputes regarding the interpretation or application of agreements. A denial of that right will produce no real benefits to individual employees, will impair the effectiveness of representatives as stabilizing influences in this field, will deprive the carriers of any agency to which they may go to secure a final settlement of many vexatious labor controversies, and will bring about a general deterioration of relations between employees and management which will necessarily impair the paramount interest of the public in uninterrupted transportation.

We respectfully submit that these results already experienced or reasonably to be anticipated from the interpretation which has been given to the Railway Labor Act are inimical to the whole purpose of the statute and should not be maintained."

"The decision of the court in effect outlaws a method which has been successfully followed for a quarter of a century in the adjustment of disputes of the kind under consideration. Thousands of individual cases have been settled during this period and up to the time of the decision in this case, no one had questioned the authority of the employees' representatives to act in this connection. The existence of such authority has always been considered as an integral and essential part of the collective bargaining process as it has developed under federal regulation. We have no hesitancy in saying to the court that we believe that its decision denying the existence of such authority reduces the potency of collective bargaining as an instrumentality of peace in the railroad industry to a lower level than that prevailing in 1920. We feel that the court should be advised that since the announcement of its decision the National Railroad Adjustment Board has virtually ceased to function. . . . This brief is filed with the deep conviction that the whole process of the orderly adjustment of controver-

672

sies, which is the fruit of railroad labor legislation obtained after long effort on the part of all concerned, is now in serious jeopardy. The potentialities of this case were not fully recognized by us when it was originally before the court."

The Brotherhood of Locomotive Firemen and Enginemen, the Order of Railway Conductors of America, and Switchmen's Union of North America united in this statement:

"We are compelled to conclude from this treatment of the problem that the Court proposes to apply a common-law standard, designedly suitable to the relatively simple relationship of principal and agent, as the test of the authority of a railway labor organization to handle and settle the host of grievances which must be expeditiously and effectively disposed of if the Congressional enjoinment 'to avoid any interruption to commerce or to the operation of any carrier engaged therein' is to be accomplished.

We wish to respectfully suggest to the Court that the entertainment of this proposed view could be commended as reasonable only if the problem under consideration were weighed wholly detached from the realities of its environment. If a strait-jacket of legal restrictions is not to shackle the railway labor organizations in the performance of the services expected of them by the Congress and the country at large as outlined in the Railway Labor Act, the mind of the Court must be accurately attuned to the practicalities of the problems faced by these representatives."

To these the Congress of Industrial Organizations on its own behalf and for its constituent unions [1] adds:

---

[1] United Steelworkers of America, United Railroad Workers of America, Amalgamated Clothing Workers of America, United Packinghouse Workers of America, Textile Workers Union of America, International Longshoremen's & Warehousemen's Union, United Office & Professional Workers of America, American Communications Association, American Newspaper Guild, Industrial Union Marine & Shipbuilding Workers of America, United Farm Equipment & Metal Workers of America, International Union of Mine, Mill & Smelter

"The Court holds that such *union settlements* are not permitted, that there must be settlement with the employees involved. It leaves open the question whether an *employee settlement* alone is sufficient or whether a *joint settlement* with employee and union is necessary (Slipsheet 20–21). It concedes that if employee settlements are permitted, then, as to most grievances at least, the union must be allowed to express its views (Slipsheet 20–21 and particularly note 35). We submit that the Act requires union settlements, with the right accorded to the employee to present grievances but not to participate in their disposition.

The disposition of grievances by employee settlements is precluded by the fact that such disposition, without consent of the union, whether of retrospective or prospective matters, introduces the very individual bargaining which Congress intended to eliminate (*supra*). That settlement of grievances is 'bargaining' was clearly recognized by the Court when it referred to the 'power to bargain concerning grievances, that is, to conclude agreements for their settlements' (Slipsheet 14). But if this 'bargaining' is to be conducted between the employer and the employee alone, it will be no more than a mockery. As the Court itself points out (Slipsheet 21, note 35), the 'carrier would be free . . . to bargain with each employee for whatever terms its economic power, pitted against his own, might induce him to accept.' "

"We earnestly urge upon the Court . . . that the collective bargaining process has always been viewed by the participants thereto as including the settlement of grievances and, more particularly, that employers and unions have always considered that they had the power to dispose of grievances on a large scale. We call to the attention of the Court the agreement

Workers, National Maritime Union of America, United Electrical, Radio & Machine Workers of America, United Automobile, Aircraft, Agricultural Implement Workers of America, Transport Workers Union of America, United Furniture Workers of America, United Transport Service Employees of America, State, County & Municipal Workers of America, Fur & Leather Workers Union.

**674**

involved in this very case, referred to by the Court in its opinion (Slipsheet 4, note 5), by which the union and the railroad tried to settle all similar claims then existing. We cannot overestimate the serious consequences of making such agreements ineffective. They are commonly made wherever collective bargaining is established. It will be extremely disturbing to employers and employees alike when employers discover that there is no way, short of settlement with each employee, whereby pending disputes and the possibility of future legal action can be eliminated."

Seldom if ever have the claims of policy been so marshalled on a single side of an issue requiring the interpretation of a statute which, at best, is sufficiently ambiguous to permit these considerations of policy to carry the day. The danger in "adhering" to the original decision is only too clear; it can hardly be lessened by an explanation that extracts meaning from the first opinion.

The results of the opinion of last Term, actual and potential, threatened not only the efficacy of the Railway Labor Act, but generally undermined the basis for all collective bargaining in regard to grievances. It is fair to say that the decision created havoc in the railroad world, for a proper adjustment of industrial relations on the railroads, as the whole course of railroad history shows, is absolutely dependent on appropriate machinery and process of adjustment. The machinery set in motion by the Act was stopped by the opinion. Immediately after the Court's decision of last Term, the two divisions of the Adjustment Board dealing with 94% of the cases under normal circumstances completely shut down. And when they were reopened, they functioned at only a fraction of their normal activity. These Boards are not operating in a vacuum. Their function is to settle by peaceful means employee-employer disputes that would otherwise be settled by a show of power on each side. The Brotherhoods point to the dangers cumulating in the unadjusted grievances. The Railway Labor Act becomes as ineffective as

it was prior to the 1934 amendments; and such a result might well have been anticipated from the destruction of a system that had become customary.

The Court says that it adheres to its previous opinion. Last Term it found that it could not say that the respondents had authorized the union to settle their grievances, and remanded the case for judicial redetermination of the Board's decision. Whatever requirements the Court meant to indicate as sufficient to establish authorization from members of the union to the union, the opinion surely conveyed doubt whether the respondents had given authority in a "legally sufficient" way, and encouraged the respondents' claim that they had not authorized their collective agent to settle their grievances. The Court now says that on the record it may be difficult for respondents to prove that they did not authorize the union to represent them. The difficulty becomes apparent as the Court's opinion proceeds. It disclaims that common law agency tests of authority are to be determinative, substitutes "custom and usage," and puts the burden of persuasion on the respondents, having against them the weight of the Board's "expertise," the presumption of regularity, and their own failure to disavow the proceedings before the Board. The hypothetical factors which the Court intimates would defeat respondents' right to sustain this suit are the normal factors in these disputes and are revealed by the record in this case. The way in which these grievances were handled was "the usual manner"; the Adjustment Board exercising its expertness did determine that the union had authority to represent respondents; the respondents did stand by doing nothing while their claims were presented to the Board and determined by it. If the custom of the railroad industry rather than the conventional law of agency is to govern, clearly the expert, centralized Board is the appropriate tribunal for ascertaining whether the authorized bargaining agency

is authorized to represent the grievances of its members before the Board, and not the multitudinous courts throughout the country with their varying understanding and varying judgments. The gloss which the Court now puts on its previous opinion in effect recognizes that this is so by the extent to which it hobbles the right to secure the revision of the Board's determination which it abstractly bestows. Thereby it undermines any justification for the notion that Congress intended to open the courts for a redetermination of the issue of authorization. When Congress was so miserly in granting any jurisdiction to the courts under the Act, it would be surprising if it had authorized review in a field where, as the Court's new opinion makes clear, there was likely to be so little dispute. Yet it is suggested that respondents are entitled to a judicial hearing to determine among other things whether they received individual notice of the proceedings before the Board. But the whole course and current of the railway trade union relationships imply that the interest of the individual member as to issues arising under the collective agreement is entrusted to his chosen representative. To require notice to the particular individuals affected by the specific controversies is to disregard the presupposition of the relationship between union members and their officials and the actualities of practice upon which the Railway Labor Act was based.

If the context of history into which the Railway Labor Act must be placed for a proper interpretation reveals that Congress was bent on creating a system complete in itself for securing peaceful industrial relations in the railroad world, this Court should not import into that system traditional assumptions and rules derived from a scheme of judicially enforceable rights. The new system was devised precisely for the purpose of replacing the ordinary judicial processes in resolving railway labor controversies, except in the very limited instances where Congress specifically retained judicial participation. The whole statute

reveals the restricted opportunities for resort to the courts which Congressional policy deemed it appropriate to reserve, even though such restrictions were not formulated with exquisite or explicit precision. By §§ 3 First (p) and 9, 44 Stat. 577, 578, 585, 48 Stat. 1189, 45 U. S. C. §§ 153 and 159, Congress gave courts jurisdiction, thus showing that the subject of judicial remedies was present in the mind of Congress and indicating the strictly defined limits within which they were available. In short, the policy of the legislation, derived from a long and painful experience, is to keep labor controversies on the railroads out of the courts except in the few specifically defined situations where Congress has put them into the courts. Congress has made a departure in the Railway Labor Act from the normal availability of judicial remedies, and we ought not to read the new law through the spectacles of the old remedies.

A court which has held that under the Railway Labor Act a Board's interpretation of its authority given by a provision of the Act is final and not subject to judicial review denies that another Board under the Act may determine finally whether those who submit controversies on behalf of their members have authority to make such submission so that the Board may settle such disputes, although the determination of the controversy itself is not reviewable unless it involves a money award. See *Switchmen's Union* v. *National Mediation Board,* 320 U. S. 297. Railway Labor Act, § 9 Third, 44 Stat. 577, 585, 45 U. S. C. § 159. The answer to such a mutilating construction of the Railway Labor Act was given by this Court in *General Committee of Adjustment* v. *Missouri-Kansas-Texas R. Co.,* 320 U. S. 323, 333: "The inference is strong that Congress intended to go no further in its use of the processes of adjudication and litigation than the express provisions of the Act indicate."