OMIE R. WILSON, Respondent, v. ST. LOUIS-SAN FRANCISCO RAILWAY COMPANY, a Corporation, Appellant, No. 42515—247 S. W. (2d) 644.

Division Two, March 10, 1952.

Motion for Rehearing or to Transfer to Banc Overruled, April 14, 1952.

*E. G. Nahler, J. L. Homire, C. H. Skinker, Jr.,* and *W. W. Dalton* for appellant.

1170

*Forrest Boecker* for respondent.

BARRETT, C.—In this action for damages for breach of a railroad-union contract in unjustly and wrongfully discharging the plaintiff as an engineer, the plaintiff, Omie R. Wilson, has recovered a judgment of $14,080.

The action and judgment are against the St. Louis-San Francisco Railway Company, a corporation, and at the outset of its appeal we are confronted with the claim that the court erred in not sustaining its motions and directing a verdict for the railroad for the reason that the plaintiff was never employed by the defendant corporation

and, therefore, it did not discharge him. It is the appellant's contention that the employer-employee relationship never existed as between the corporation and the plaintiff. The basis of the contention is that during Wilson's tenure the railroad was operated by trustees and if there was any liability to the plaintiff it was upon the trustees and not upon the reorganized railroad corporation. In its answer the railroad corporation denied liability to Wilson and all the proof was that during the period in question Wilson was not employed by the railroad corporation, the corporation had no employees whatever, but that Wilson was employed by the trustees. But, despite the plea and these undisputed facts, volume thirteen of the proceedings concerning the reorganization of the railroad in the United States District Court, in the "Consummation Order and Final Decree," in paragraph 8.03, "Transfer of Liabilities of Debtor Trustee," it is recited: "From and after the Consummation Date there shall be no liability on the Debtor Trustee for any obligations incurred by him in his official capacity as Debtor Trustee pursuant to the authority of this Court, *but the Reorganized Company shall alone become and be liable for any and all such obligations in the place and stead of the Debtor Trustee and shall indemnify and hold the Debtor Trustee harmless against all such obligations* and any failure on the part of the Reorganized Company to satisfy them." The railroad sought to show by cross-examination of the Clerk of the United States District Court that enumerated lists of liabilities and obligations followed this paragraph, the inference being that the other liabilities were excluded, but in the circumstances, as the trial court in effect instructed the jury, the question is not debatable and if there is any liability to the plaintiff it is now upon the reorganized corporation. Stuart v. Dickinson, 290 Mo. 516, 235 S. W. 446; Texas & P. R. Co. v. Manton, 164 U. S. 636, 17 S. Ct. 216, 41 L. Ed. 580; 74 C. J. S., Sec. 388(b), p. 935.

 Upon the merits of the appeal the railroad insists, first, that the controversy arose out of a railway labor agreement, a matter within the jurisdiction of the National Railroad Adjustment Board, to which the plaintiff's claim had been submitted, and that board having taken cognizance of the claim obtained exclusive jurisdiction, to the end that courts had no jurisdiction over the subject matter of the suit. The plaintiff's claim or grievance was handled by the local lodge of his union in a hearing before company officials and subsequently was filed by the General Chairman of the Grand Lodge with the National Railroad Adjustment Board where his claim was denied in an ex parte presentation and, therefore, it is urged that the plaintiff's claim and cause of action was res adjudicata and, accordingly, the trial court erred in not directing a verdict for the railroad. The difficulty with the railroad's argument is that the issues upon the record before us are not so simple. If these were the issues necessarily involved in the appeal, as the argument assumes, the railroad's conten-

tion would certainly be decisive. The subject of this action was a matter within the jurisdiction of the National Railroad Adjustment Board (45 U. S. C. A., Sec. 153) but the mere fact that it was a claim or a grievance growing out of a labor agreement, or the mere fact that Wilson was a member of the union, did not in and of itself give the board exclusive jurisdiction. The plaintiff had the right of election to proceed before the board or to file this suit at common law (Moore v. Illinois Cent. R. Co., 312 U. S. 630, 61 S. Ct. 754, 85 L. Ed. 1089) and the question involved here is whether he irretrievably ▇▇▇ made that election. If Wilson had "voluntarily" prosecuted and submitted his claim to the board, its denial would constitute a bar to his action for damages for breach of contract (Williams v. A. T. & S. F. Ry. Co., 356 Mo. 967, 204 S. W. (2) 693; Michel v. Louisville & N. R. Co., 188 F. (2) 224; Kelly v. Nashville, C. & St. L. Ry. Co., 75 F. Supp. 737; Berryman v. Pullman Co., 48 F. Supp. 542) but the question here is whether as a matter of fact he did so present and prosecute his claim before the board that its action on the claim is a bar to this suit. More accurately the question involved here is whether Wilson "in some legally sufficient way" irretrievably authorized his collective agent, the general chairman, to act in his behalf in presenting his claim to the board. Before the union may act in his behalf with conclusive effect authorization to so act must appear "over and above any authority given by the statute." Elgin, Joliet & Eastern Ry. Co. v. Burley, 325 U.S. 711, 65 S. Ct. 1282, 89 L. Ed. 1886; rehearing granted 326 U. S. 801, 66 S. Ct. 86, 90 L. Ed. 488; previous opinion adhered to and expanded 327 U. S. 661, 66 S. Ct. 721, 90 L. Ed. 928. Whether he gave that authorization, and whether he has sustained the burden imposed upon him, under the second Burley opinion, is an inference to be drawn from all the facts and circumstances as submitted in the railroad's instruction four. But the railroad, of necessity, insists that the facts of record show as a matter of law authorization to the general chairman to handle the claim, knowledge by Wilson that it was presented and decided and hence its conclusive effect. As a matter of fact the very thing that the majority of the Supreme Court of the United States, in the second Burley opinion, anticipated as not likely to occur has happened, for Wilson not only claims that he did not voluntarily present his claim to the board, but that he did not authorize the general chairman to present it for him and that he had no knowledge of its presentation or of the action of the board until long after the event. Whether the precise question is determinable as a matter of law or whether it was a question of fact resolved by the jury's finding requires a brief narration of the facts and circumstances.

On June 10, 1944 Wilson was the engineer on a freight train involved in a head-on collision with another train near Stoutland, Missouri. As a result of the collision and in accordance with the

union contract the railroad gave Wilson notice to appear before the assistant general manager "with representative of your choice, for investigation in connection with accident fifth 34 and fifth 33 near Stoutland June 10th." As a result of that hearing and a hearing before the general manager Wilson was dismissed from the railroad service. In those hearings he was represented by the general chairman of his union. Upon receipt of the company's letter of dismissal Wilson, pursuant to union procedure, took his grievance of dismissal up with his local lodge and the local voted to seek his reinstatement. The local chairman presented the claim and the company refused to reinstate him. Wilson says that the local chairman then turned the claim over to the general chairman, in August 1944, and he was likewise unsuccessful in his efforts to secure reinstatement by the railroad officials. Thereafter, on October 3, 1944, the general chairman gave notice to the National Railroad Adjustment Board and the railroad that Wilson's claim or grievance for reinstatement with pay for all time lost would be submitted to the First Division of the board, ex parte, in Chicago. In April 1948 the board denied Wilson's claim. There is no dispute concerning this sequence of events or occurrences except that Wilson categorically denies that he had notice or knowledge of the proceedings before the board or of its decision until after the event. He stated that he never received a copy of any letter, notice or document concerning the claim before the board.

He admits that he talked to the general chairman when the claim was turned over to the chairman in August 1944 but he says that the principal subject of conversation concerned awaiting the arrival of the Interstate Commerce Commission's report and investigation of the wreck. He said that the chairman talked about taking the case to the National Railroad Adjustment Board, but he said, "I had sued the Locomotive Firemen and Enginemen for insurance claim before, so they were sore at me, so I told him that I wouldn't think of going to the Labor Board, because if the Frisco officials could get the representative of the Interstate Commerce Commission and entertain him so and he would give false report about me, why, they could sure fix me up; and five-men jurisdictional board representing the employees and five representing the railroad, and taking the one off, there would be your majority, and I said I wanted him to withdraw the engineers from service, and he wasn't going to do that for one man, and I said, 'Well, that affects all engineers on the Frisco system,' and I said, *'Forget about my case,' I would handle it myself through the courts.''* He admits that at the instigation of the general chairman, on August 29, 1945, (the claim was filed in October 1944) he signed the usual authorization form in which he authorized the general chairman of the brotherhood to handle his grievance to a conclusion before "any person, board or other tribunal" and to receive notice of hearings and to appear for him. He claims, however,

that he signed the blank form and that it was his understanding that the form was to be used in connection with a grand officer's attempt to get him reinstated. In any event about two months later, after signing the authorization, he appeared at the general chairman's office "to see what progress had been made, and there had been no progress made, *and I told him to give me back my authorization and to drop my case entirely. I got up and - - he give me back my authorization, and right there in his waste basket I cut my name off of it and stuck it in my pocket, and I was up on my feet starting out the door, I turned around and I said, 'Now, you understand this is the last time I want anything done in my case.'* " The railroad introduced in evidence, from the general chairman's file, a signed "carbon original" of the authorization but Wilson produced the original at the trial of this case with his signature cut off.

The general chairman, testifying for the railroad, admitted that Wilson talked to him about withdrawing his claim "before the signing of the authority" and "before the case was submitted to the adjustment board in '44." But it was his position, once a grievance was turned over to him by the local lodge, that *"it is left to his discretion as to advisability of handling it to final conclusion"* and that the employee no longer had any control over the matter. He said that the only way a claim could be withdrawn from him was through the local lodge and that this one was not so withdrawn. He said that the written authorization was not necessary either when given or at the time of the trial. As to the presentation of the claim to the National Railroad Adjustment Board he said, "After the local lodge, the organization, had accepted his case he didn't have anything more to say about it." As to Wilson's requesting him to drop the matter, after submission to the board, he said, "Yes, I remember having some conversation with Mr. Wilson to the effect that *he would rather drop the case and go to court with it, but I declined to do that, and proceeded to handle the case along the lines that I thought was to the best interest of the organization and Mr. Wilson also; therefore I continued to handle the case."* In conclusion he said, "I told him I wasn't going to drop it."

The union constitution and by-laws were not offered in evidence and there was no other testimony concerning this subject except that the general chairman appeared and submitted Wilson's claim to the board and the board denied the claim after a finding that the validity of his dismissal was dependent upon irreconcilably conflicting testimony. As we understand the majority opinions in the Burley case, it may not be said as a matter of law that Wilson so irretrievably authorized the general chairman to represent him or to submit his claim to the board that the board's determination of the claim concludes him in this action. In all the circumstances the inferences to be drawn were of fact and they have been resolved by the jury's finding. Elgin,

Joliet & Eastern Ry. Co. v. Burley, supra; McCoy v. St. Joseph Belt Ry. Co., (Mo. App.) 77 S. W. (2) 175, 182.

In connection with the issue of wrongful discharge the railroad insists that the plaintiff failed to show that the hearings before the company officials were arbitrary or that section fifty-two of the contract, engineers schedule—"Engineers shall not be discharged, suspended or given demerit marks without just and sufficient cause," was violated. It is also urged that Wilson failed to show that he could comply with the contract by being mentally, physically and technically qualified to perform the duties of an engineer. If the trial court did not err in refusing to direct a verdict for the railroad for these reasons it is insisted that the appellant is entitled to a new trial because of the improper admission of hearsay evidence upon the first of these questions, and for the further reason that the trial court erred in instructing the jury.

The contention that Wilson failed to show that he was discharged in violation of the contract is that in his petition the allegation was that he was "discharged without just and sufficient cause after a purported investigation and hearing which was entirely arbitrary." Therefore it is said that any other issue or proof was beyond the scope of the pleadings and that Wilson should not have been permitted to prove or have the jury decide, on evidence independent of the company's investigation, whether he in fact violated the rules in running a red light, thereby causing the head-on collision. Upon the issue as the railroad says it was pleaded, it is pointed out that there was no evidence that the hearing before the company officials was arbitrary or unfair in any manner. On the contrary, all the proof was that the hearing was held in accordance with the terms of the contract and was fairly conducted, and upon the evidence before the officials Wilson's dismissal was justified. The quoted language is employed in the plaintiff's petition, but preceding this allegation it is alleged that "plaintiff's employment was terminated by defendant, wrongfully, without cause and in violation of plaintiff's rights" under the contract. The principal instruction submitting the issue set forth Section 52 of the agreement and hypothesized for the jury Wilson's contention that the first signal showed green, that he operated the train in accordance with the signals but nevertheless the collision occurred, and, in this connection the jury was instructed "if you further find that such collision was not due to any fault or neglect of plaintiff" and that the railroad investigated the cause of the collision "and from the evidence available did unreasonably and arbitrarily determine that plaintiff was at fault and thereafter discharged plaintiff from his employment account plaintiff's alleged responsibility for said collision, and if you find that such discharge was without good and sufficient cause" there was to be a verdict for the plaintiff, Wilson. Obviously the issue as objected to by the railroad was not

beyond the scope of the pleadings and the court was not in error in instructing the jury upon the subject. Wilson's evidence tended to show that he obeyed the signals, and the railroad's evidence tended to show that he violated the signals and the rules and whether he did or not and whether he was discharged without good and sufficient cause were for the jury to determine. Johnson v. Thompson, (Mo. App.) 236 S. W. (2) 1; Hall v. St. Louis-S. F. Ry. Co., 224 Mo. App. 431, 28 S. W. (2) 687.

In the investigation before the railroad officials to determine the cause of the wreck and to place responsibility for it a reporter took the statements of over fifty persons concerning the head-on collision and the condition of the signals. In proof of whether he had violated the rules and the signals the plaintiff, over the objections of the railroad, read to the jury numerous excerpts from these statements. Because the statements were hearsay the railroad now urges that this evidence was prejudicially erroneous and for that reason it is entitled to a new trial. The respondent contends that these statements "were statements made by employees and agents of the defendant as to facts learned within the scope of their authority * * * made by said agents to their principal * * * while acting within their scope of authority and are admissible as admissions against interest." These unsworn statements were not reports or letters required to be made or kept and they were not so-called "res gestae" statements. Phillips v. St. L.-S. F. R. Co., 211 Mo. 419, 111 S. W. 109; 31 C. J. S., Secs. 345, 346, pp. 1119-1120; 20 Am. Jur., Sec. 596, p. 505. They were not merely corroborative and cumulative of some properly admissible documentary evidence and, therefore, harmless in their effect. Chicago, St. P., M. & O. Ry. Co. v. Kulp, 102 F. (2) 352, 356. They were hearsay and do not come within any of the recognized exceptions to the hearsay rule. The admissibility and prejudicial effect of similar statements in a similar action was the principal question in Tennison v. St. L.-S. F. Ry. Co., (Mo.) 228 S. W. (2) 718, and it was there determined that they were hearsay and inadmissible in the circumstances in which they were employed in this record. Every question or reason advanced here for their admissibility was advanced and considered there and that completely exhaustive opinion is controlling in the circumstances of this record, and because they were admitted the railroad is entitled to a new trial. Johnson v. Thompson, supra.

The argument that the railroad was entitled to a directed verdict because Wilson failed to show that he could comply with the contract "by being mentally, physically and technically qualified to perform duties of an engineer" is presented in this manner: The railroad points to his testimony and that of his doctors, developed by cross-examination of him, in his personal injury action in which the nature and extent of his injuries was described, to his petition in

that action alleging the nature and extent of his injuries, and to the fact that the plaintiff had not submitted to the usual two-year physical examination required of engineers, and contends, therefore, that he has not shown "his bona fide readiness to perform" the contract. It is said that suits for wrongful discharge are based upon proof of actual loss, "it must be based upon the time that he could have performed the work." In the first place Wilson was dismissed from the service because of his responsibility for the wreck in ignoring the signals and thereafter there was no question as to his physical or mental ability to perform the duties of an engineer. His request for reinstatement, in effect an offer or tender of performance, was not denied because of any physical or mental disability, it was simply denied, presumably because of his responsibility for the head-on collision and the resulting $330,000 damages to trains and cargo. Of course it was incumbent upon him as a part of his case to show that he was mentally capable and physically able to perform the duties of an engineer under the contract (Cramer v. Mack, 8 Mo. App. 531) but this question, as with many others involved upon this appeal, was likewise one of fact. There were the unfavorable inferences the railroad draws from the indicated testimony. But he testified that he had recovered from his disabilities, that he was mentally and physically capable of performing the duties of an engineer. In the only instruction concerning this subject, the damage instruction, the jury was to compensate him "during the period of time since plaintiff's discharge as he has been ready, willing and able to perform the duties of his job as railroad engineer." In any event, as indicated, the railroad was not entitled to a directed verdict upon the sole assignment of the plaintiff's failure to show that he could comply with the contract by reason of mental and physical fitness. As a matter of fact this issue is related to and involved in what may be termed the second phase of this action and appeal, a matter not directly concerned with the union contract, its performance or breach.

In January 1945 Wilson instituted an action, under the Federal Employers' Liability Act, against the railroad in which he sought $150,000 damages for his personal injuries resulting from the head-on collision of the two trains at Stoutland. In that action a jury returned a verdict in his favor for $53,750. After notice of an appeal by the railroad that judgment was satisfied or settled for the sum of $35,000, from which Wilson testified he received the sum of $22,000. The railroad contends that it was entitled to a directed verdict for the reason that "Plaintiff has here recovered a second time for alleged loss of wages for which he has already been compensated." The railroad points to the allegations in his petition in that suit concerning the nature and extent of his injuries and to the testimony, developed on cross-examination of him in this action, concerning the nature and extent of his injuries and the claim and proof

that he had been "seriously and permanently injured" and insists from these facts alone that, in effect, there has been a double recovery and, therefore, he may not recover in this action. Of the general rule there is no doubt, there can be but one recovery, satisfaction, or compensation, for the same demand, loss or injury. Adams v. Southern Pac. Co., 204 Cal. 63, 266 P. 541; 257 P. 551; Adams v. Cameron, 27 Cal. App. 625, 150 P. 1005; 151 P. 286. But upon this record the matter may not be summarily disposed of as it could and was in Buberl v. Southern Pac. Co., 94 F. Supp. 11. There the action for damages for breach of contract was instituted within five months of an engineer's recovery of $26,750 damages for personal injuries under an allegation that he would be "permanently disabled from following his usual occupation." Wilson's damage suit was instituted in 1945 and his petition in this case was filed in June 1949 and the cause tried in October 1950. The only information here concerning his former suit, as indicated, is the prayer in his first petition and Wilson's statements as to what he did and did not claim in his first suit, and the amount of his settlement. Even though he was entitled to but one satisfaction for the same loss, Wilson had two separate and distinct causes of action against the same person (Parkell v. Fitzporter, 301 Mo. 217, 256 S. W. 239) and the real question here is whether the losses and injuries, here lost wages, were included in, paid for, or satisfied in the former suit and that question is not conclusively or confidently answerable as a matter of law upon this record. Staehlin v. Hochdoerfer, (Mo.) 235 S. W. 1060; Adams v. Southern Pac. Co., supra. Whether the loss claimed here, or any part of it, was also claimed and fully satisfied in Wilson's former suit is a question of fact, a question not intelligibly answerable as the record in this cause now stands. Parkell v. Fitzporter, supra; Ash v. Mortensen, (Cal.) 150 P. (2) 876; Wheat v. Carter, 79 N. H. 150, 106 Atl. 602. And aside from the difficult factual question there were no instructions upon the trial of this case demarcating and delimiting the recoverable losses except as indicated in the one general instruction on the measure of damages. Since the cause is to be remanded for another trial because of the prejudicially erroneous admission of evidence, it is unnecessary to consider this subject further, or to determine whether the instructions given were prejudicially erroneous or whether the verdict is excessive.

For the reason stated the railroad is entitled to a new trial and, accordingly, the judgment is reversed and the cause remanded. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.