338 F.2d 407
 BROTHERHOOD OF RAILROAD TRAINMENT, G. W. Black and R. E.
Gardner, Appellants and Cross-Appellees,
v.
The DENVER AND RIO GRANDE WESTERN RAILROAD COMPANY, Appellee
and Cross-Appellant.
 Nos. 7651, 7652.
 United States Court of Appeals Tenth Circuit.
 Nov. 19, 1964.
 
 James L. Highsaw, Jr., Washington, D.C. (Philip Hornbein, Jr., and Hornbein & Hornbein, Denver, Colo., and Mulholland, Hickey & Lyman, Washington, D.C., of counsel, on the brief), for appellants and cross-appellees.
 Walter J. Cummings, Jr., Chicago, Ill. (T. A. White and Kenneth D. Barrows, Jr., Denver, Colo., and Ray Garrett, and Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel, on the brief), for appellee and cross-appellant.
 Before MURRAH, Chief Judge, and PHILLIPS and LEWIS, Circuit Judges.
 LEWIS, Circuit Judge.
 
 
 1
 This is an action brought under Section 3 First (p) of the Railway Labor Act, 45 U.S.C. 153 First (p), to enforce an order of the National Railroad Adjustment Board, First Division. The Board order determined that the appellee railroad had violated its collective bargaining agreement with the appellant Brotherhood and granted an award to the individual appellants, as employees of the railroad and members of the craft represented by the Brotherhood, of one day's full pay for each claim filed. The cause was submitted to the District Court upon stipulated facts. That court held that the Board had correctly determined that the railroad had breached its bargaining agreement but had incorrectly determined the amount of the allowable award. Judgment in the District Court was entered in favor of the individual claimants for nominal damages of one dollar per day for each claim. By cross appeals the parties assert error in the portion of the judgment that is adverse to their respective interests.
 
 
 2
 The undisputed pertinent facts may be summarized. Prior to March 6, 1952, the railroad operated a forty-five mile straight-away run between terminals located at Provo and Eureka, Utah. On March 6 the railroad notified the Brotherhood that the run would be changed from a straight-away to a daily turnaround run operating over the same line. As a result, the crew would return each evening to the home terminal, Provo, rather than every other evening. The change required the same number of crew members, called for the same rate of pay, and maintained the same length of assignment, six days per week. The Brotherhood protested the unilateral action of the railroad in effectuating the change, asserting it to be subject to negotiation under the provisions of Article 64 of the collective bargaining agreement; the railroad contended that such interpretation of Article 64 was incorrect. Article 64 provides:
 
 
 3
 'Establishing New Runs
 
 
 4
 'The Company is not prohibited by any Article or provision of this Agreement from establishing new runs, or new assignments. Notices calling for bids on any new run or new assignment must state definite limits and must show number of days per week (6 or 7) to be worked and time crew will go on duty.
 
 
 5
 'Rates of pay for any new run or new assignment will be in accordance with rates for similar assignments on the same Sub-Division. If no similar assignment on the same Sub-Division, rates of pay will be a matter of negotiation between the designated General Officer and General Chairman of the Brotherhood of Railroad Trainmen.
 
 
 6
 'Note: Time for crews to go on duty will not be changed without at least 48 hours' notice. When time to go on duty is changed one (1) hour or more the assignment will be rebulletined.'
 
 
 7
 In interpreting Article 64 both the Board and the District Court concluded that the railroad had violated its terms. We hold that such determination is within the bounds of reasonableness and consequently not in error. Article 64 became part of the collective bargaining agreement in 1945, prior to which the agreement had specifically required the railroad to negotiate new runs. By Board decision and by practice this earlier provision had been interpreted and applied as highly restrictive upon the right of the railroad to change tabulated assignments or working conditions without negotiation. In bargaining for the 1945 contract the railroad proposed a revision of the provisions of Article 64, the pertinent part of such proposal reading:
 
 
 8
 'Establishing New Runs-- Freight or Mixed Service
 
 
 9
 'The Company is not prohibited by any article or provision of this Agreement from establishing new runs, or new assignments, or from discontinuing or re-arranging old assignments. Notices calling for bids on any new run, new assignment or re-arrangement of an old assignment must state definite limits and must show number of days per week (6 or 7) to be worked.
 
 
 10
 'Rates of pay for any new run, new assignment or change in old assignment will be in accordance with similar rates for similar assignments on the same sub-division. If no similar assignment on the same sub-division, rates of pay will be through freight rates (plus conversion rates if local work as defined in Conversion Rule (5-D) is performed.'
 
 
 11
 The proposal of the railroad was accepted by the Brotherhood only in part, and all reference to the re-arrangement of assignments was deleted. And while the apparent significance of proposal and counterproposal of parties engaged in the continuing and repetitive technique of collective bargaining may not always be reliable as a complete reflection of the parties' intent, we are satisfied in the case at bar that the history of Article 64 is ample support for the court's conclusion as to the article's proper interpretation. Certain it is that the railroad's contention that its change from a straight-away to a turnaround run established a new run or assignment, specifically authorized by Article 64, is both strained and unpersuasive.
 
 
 12
 Subsection First (p) of 45 U.S.C. 153 provides that the suit in the District Court 'shall proceed in all respects as other civil suits, except that on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated * * *.' Although the Board order awards to the individual appeallants a full day's pay for each claim filed, both the findings and the order of the Board make no mention of the basis for the amount of the award. And since the parties have stipulated that the aggrieved employees have suffered no actual monetary loss or hardship from the contract violation, both the weight of the Board order as evidence of fact and the presumptive correctness of the Board order, Elgin, Joliet & Eastern Ry. Co. v. Burley, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928, are completely dissipated. The District Court, then proceeding as in 'other civil suits,' limited the award to nominal damages and refused enforcement of the Board order to a greater extent.
 
 
 13
 The collective bargaining agreement contains neither a provision for liquidated damages nor punitive provisions for technical violations. The Board has no specific power to employ sanctions and such power cannot be inferred as a corollary to the Railway Labor Act. See Priebe & Sons v. United States, 332 U.S. 407, 413, 68 S.Ct. 123, 92 L.Ed. 32. And if, as counsel for the Brotherhood contends,[1] there exists within the industry a long established and accepted custom to pay what would amount to a windfall for contract violations such as here occurred, such custom was not established by finding, nor requested as a finding, in the procedures before either the Board or the District Court. We conclude that the District Court correctly determined that the instant case is governed by the general law of damages relating to contracts; that one injured by breach of an employment contract is limited to the amount he would have earned under the contract less such sums as he in fact earned. Atlantic Coast Line R. Co. v. Brotherhood of Ry. Clerks, 4 Cir., 210 F.2d 812, 815; United Protective Workers of America, Local No. 2 v. Ford Motor Co., 7 Cir., 223 F.2d 49, 53-54, 48 A.L.R.2d 1285. Absent actual loss, recovery is properly limited to nominal damages. Oklahoma Natural Gas Corp. v. Municipal Gas Co., 10 Cir., 113 F.2d 308; Norwood Lumber Corp. v. McKean, 3 Cir., 153 F.2d 753; 5 Williston, Contracts (rev. ed.) 1339A.
 
 
 14
 The judgment is affirmed. Each party shall bear its own costs.
 
 
 
 [1]
 Counsel states that a review of awards of the National Railroad Adjustment Board as of September 18, 1963, indicates that 'there are more than 1,000 cases involving railroads throughout the United States, in which a carrier has been required to pay a basic day's pay for a violation of a contract provision although the contract did not contain any provision for punitive damages or penalties. At least 110 of these awards involved the D&RGW.' We have not, of course, made such a review. However, we find no statement in any of the awards to which we have been specifically referred that indicates the alleged custom to have been established as a fact. And, indeed, several of the awards hold that actual loss is a prerequisite to an award